Filed 2/27/15; pub. order 3/27/15 (see end of opn.)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| TAMI L. WINTERNITZ,<br><br>    Appellant,<br><br>    v.<br><br>WILLIAM W. WINTERNITZ, JR.,<br><br>    Respondent. | D065131<br><br><br>(Super. Ct. No. D536848) |

APPEAL from orders of the Superior Court of San Diego County, William McAdam, Jr. and Christine K. Goldsmith, Judges.  (Retired judges of the San Diego Sup. Ct.)  Affirmed.

Kim M. Robinson, Barbara A. Kauffman and Jennifer A. Hilton for Appellant.

Edward Stephen Temko and Dennis Geis Temko for Respondent.

Tami Winternitz (Mother) appeals the denial of her move away request involving her daughter Jamison (born 2001) with ex-husband Dr. William Winternitz (Father).  She asserts the custody evaluator failed to comply with

California Rules of Court, rule 5.220 and it was legal error for the family court to deny her motion to strike the evaluator's defective report. (All rule references are to the California Rules of Court.) She also claims the family court did not apply the correct legal standard in assessing her relocation request, including (1) failing to consider her presumptive right to move under Family Code section 7501, (2) not weighing all of the factors set forth in *In re Marriage of LaMusga* (2004) 32 Cal.4th 1072 (*LaMusga*), and (3) not giving meaningful consideration to Jamison's custodial preference to remain in her care as required by Family Code section 3042. (Undesignated statutory references are to the Family Code.) She also contends the family court abused its discretion by failing to award her any need based attorney fees after May 21, 2013. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. First Move Away Request

The parents married in 1985. Father is an orthopedic surgeon. The couple had three children: Jill, Jana and Jamison. The couple separated in August 2001, shortly after Jamison's birth. The Yolo County Superior Court dissolved their marriage in 2004. To help determine custody of their then three minor children, the couple stipulated to the appointment of Frank Leek as a custody evaluator. In his June 2003 report, Dr. Leek addressed Mother's request to relocate the children to San Diego. Dr. Leek found that Mother manipulated the children. He reported that therapists who met with both parents concluded that Mother alienated the children from Father. Dr. Leek initially recommended the children remain with

2

Father.  In an amended report, Dr. Leek changed his recommendation to permit Mother's relocation with the children.  He notes changes that occurred over the year, including Mother's act of alienating the children and the children's strong opposition to living with Father.  Dr. Leek believed that by staying with Mother, the children would make a less conflicted adjustment and the possibility of reconciling with Father would be left open.

A March 2005 custody order found that Mother engaged in tactics "resulting in the alienation of the minor children from Father."  Despite this finding, the court allowed Mother to relocate with the children to San Diego.  The order provided that custody would be modifiable on the children's best interests without showing a change in circumstance.  After Mother moved to San Diego with the children, Father relocated to San Diego and established an orthopedic surgery practice there.

B.  Instant Move Away Request

After some initial proceedings in the Yolo County Superior Court, Mother filed a move away request in the San Diego Superior Court seeking an order to move Jamison with her to Chico, in northern California, where she had purchased a home.  Mother sought to move as she had reconnected with a friend, Evan Said, to whom she was now engaged, Evan's former employer rehired him to work in Chico, Mother was unable to find a job in San Diego and she could not afford a home there.  In turn, Father moved to modify custody and visitation, seeking physical custody of Jamison.

3

In July 2012, Father and Mother met with Family Court Services (FCS). The FCS report concluded with a recommendation that Mother remain Jamison's primary caregiver. Father did not agree with the FCS recommendation; accordingly, he requested a custody evaluation and evidentiary hearing. The family court granted Father's request and appointed Robert Simon, Ph.D. to conduct a custody evaluation.

Dr. Simon submitted his custody evaluation report in March 2013, recommending that the move away request be denied and Jamison placed with Father. He interviewed Father and Mother, separately and with Jamison. He spent over 14 hours interviewing Father and over 20 hours interviewing Mother. He also interviewed Jamison, Jill, Jana, Evan and Cheri (Mother's younger sister). Dr. Simon admitted making mistakes in the case and Mother's counsel cross-examined him at length on his conclusions and impartiality.

After considering Dr. Simon's report, hearing testimony and argument from counsel, the family court denied Mother's move away request and changed primary custody of Jamison to Father. The family court found that Father met his burden of showing the planned move would cause substantial detriment to Jamison. It then addressed the *LaMusga* factors and found that changing custody to Father was in Jamison's best interests. Mother filed several requests for an award of attorney fees and costs, which the family court denied. Mother timely appealed from the denial of the move away order and the denial of attorney fees and costs.

4

DISCUSSION

I. *Move Away Request*

A. General Legal Principles

"A parent entitled to the custody of a child has a right to change the residence of the child, subject to the power of the court to restrain a removal that would prejudice the rights or welfare of the child."  (§ 7501, subd. (a).) Accordingly, when a custodial parent proposes to relocate a child, "the noncustodial parent has the burden of showing that the planned move will cause detriment to the child in order for the court to reevaluate an existing custody order."  (*LaMusga*, *supra*, 32 Cal.4th at p. 1096.)  "The extent to which a proposed move will detrimentally impact a child varies greatly depending upon the circumstances.  We will generally leave it to the superior court to assess that impact in light of the other relevant factors in determining what is in the best interests of the child."  (*Id.* at p. 1097.)  If the noncustodial parent carries the threshold burden of showing that the planned move would cause detriment to the child, the "court must perform the delicate and difficult task of determining whether a change in custody is in the best interests of the child[]."  (*Id.* at p. 1078.)

As the *LaMusga* court stated, "[T]his area of law is not amenable to inflexible rules."  (*LaMusga*, *supra*, 32 Cal.4th at p. 1101.)  Rather, courts must "exercise their discretion to fashion orders that best serve the interests of the children in the cases before them.  Among the factors that the court ordinarily should consider when deciding whether to modify a custody order in light of the

5

custodial parent's proposal to change the residence of the child are the following: the children's interest in stability and continuity in the custodial arrangement; the distance of the move; the age of the children; the children's relationship with both parents; the relationship between the parents including, but not limited to, their ability to communicate and cooperate effectively and their willingness to put the interests of the children above their individual interests; the wishes of the children if they are mature enough for such an inquiry to be appropriate; the reasons for the proposed move; and the extent to which the parents currently are sharing custody." (*Ibid.*)

To assist in making a change in custody determination, a court may appoint a child custody evaluator to report on the best interest of children.  (Evid. Code, § 730; Rule 5.220(b).)  The child custody evaluator must "(A) Consider the health, safety, welfare, and best interest of the child within the scope and purpose of the evaluation as defined by the court order; [¶] (B) Strive to minimize the potential for psychological trauma to children during the evaluation process; and [¶] (C) Include in the initial meeting with each child an age-appropriate explanation of the evaluation process, including limitations on the confidentiality of the process." (Rule 5.220(d)(2).)  In performing an evaluation, the evaluator has certain ethical obligations, including "[m]aintain[ing] objectivity, provid[ing] and gather[ing] balanced information for both parties, and control[ling] for bias."  (Rule 5.220(h)(1).)

6

All evaluations must include a written explanation of the process that clearly describes the following: purpose of the evaluation; procedures used and the time required to gather and assess information; scope and distribution of the evaluation report; limitations on confidentiality; and cost and payment responsibility for the evaluation. (Rule 5.220(e)(1).) In presenting findings, the evaluator must "(A) Summarize the data-gathering procedures, information sources, and time spent, and present all relevant information, including information that does not support the conclusions reached; [¶] (B) Describe any limitations in the evaluation that result from unobtainable information, failure of a party to cooperate, or the circumstances of particular interviews; [¶] (C) Only make a custody or visitation recommendation for a party who has been evaluated. This requirement does not preclude the evaluator from making an interim recommendation that is in the best interest of the child; and [¶] (D) Provide clear, detailed recommendations that are consistent with the health, safety, welfare, and best interest of the child if making any recommendations to the court regarding a parenting plan." (Rule 5.220(e)(3).)

B.  Background

At trial, Mother's counsel indicated to Dr. Simon that she would show he had been biased, citing his failure to produce documents, properly record and report what happened at interviews, as well as other things. Before proceeding, she gave Dr. Simon the opportunity to withdraw his report. When Dr. Simon declined, counsel proceeded to review the report with Dr. Simon. Among other

7

things, Dr. Simon admitted the following: he did not produce all of his telephone records because of difficulties in his office, including one person quitting and another person being fired; the last four years of his telephone records were missing from his office; he had "problems galore" in his office and that in the past six to eight weeks, he has started to "wade through the variety of errors" in his records; and he made a mistake by not informing counsel that some of his records were missing.

Near the end of cross-examination, after Mother's counsel had questioned Dr. Simon about various errors and flaws, including raising his voice to Mother at one point during an interview, counsel asked him whether someone might question his neutrality. Dr. Simon responded:

> "There were mistakes made in this evaluation in terms of procedure. That is correct. I've testified to that. And I take those mistakes very seriously, and I hold myself accountable for them. Would I have a question about whether I was neutral if I was on your side of the ledger? Yes, I would. I absolutely would have that question.
>
> "[¶ . . . ¶]
>
> "You prefaced your questions for me this morning by making a statement about what kind of ground we were going to cover. You previewed for me what was ahead, and you offered me an opportunity to withdraw my report. So I knew what was coming. Believe me, I knew what was coming, because I understood the mistakes I made in this case. And I decided to stand here, answer these questions, take the beating that was coming to me for the mistakes I made, because I believe that, ultimately - because I know that, ultimately, my stance in this case is a neutral stance. I am not in favor of either parent. I know that.

8

"Now, you may not, but I chose to stand here and get tarred and feathered because I know that. I wouldn't be here if I didn't know that. I can stand here, look you straight in the eyes, as I'm doing right this minute, and tell you with, no questions in my conscience, that I believe that I took the facts of this case in a fair and neutral way, that I am not aligned with either party. I can tell you both of their strengths and weaknesses. And that I did the very best I could do with the facts I had to reach conclusions, including many, many sleepless nights.

"Would I question my neutrality? That's exactly what you've been doing. The judge will adjudicate and decide whether I'm neutral or not. Are there lessons for me to learn? Of course."

During re-cross examination, Dr. Simon admitted he improperly accepted information directly from Father, but stated his use of the information was "little to none." After Dr. Simon had concluded his testimony, Mother's counsel orally moved to strike Dr. Simon's custody evaluation report on the ground it did not address the psychological risks to Jamison if she were not allowed to move. Mother also complained that Dr. Simon did the following: accepted information from Father without turning the information over to Mother's attorney; intervened in a custodial issue; raised his voice at Mother; did not properly respond to a subpoena from Mother while he responded immediately to Father regarding a fee issue; did not properly record time spent during interviews; focused primarily on Mother; failed to review records; and misstated information in his notes. Father asked the court to deny Mother's motion and rather weigh Dr. Simon's report against Dr. Simon's extensive cross-examination. Although the family court found

9

Dr. Simon did not prepare his report in accord with his own requirements, it declined to strike the report.

In its statement of decision, the family court acknowledged Mother had "presented some serious issues concerning the technical preparation" of the report, including Dr. Simon's violation of his own rules concerning what was required of the parties and their lawyers, and his failure to conform to requests for discovery and to provide all of his records. The court noted that many of Mother's objections to the report were valid, but found they went "to the weight of the contents of the report and [were] not sufficient to justify having the report stricken." It found Dr. Simon was not biased in favor of either party; accordingly, it considered the report and Dr. Simon's testimony in entering its decision.

C. Analysis

Mother asserts Dr. Simon failed to comply with rule 5.220 and it was legal error for the family court to deny her motion to strike Dr. Simon's defective report. She asserts we should review de novo the issue of whether Dr. Simon was biased because the essential facts are undisputed and a finding of bias would require reversal of the custody order for abuse of judicial discretion. In making this assertion, Mother relies on *In re Marriage of Adams & Jack A.* (2012) 209 Cal.App.4th 1543 (*Adams*). In *Adams*, the family court concluded that an evaluator was biased against the father, but denied the father's motion to remove the evaluator. (*Id.* at p. 1564.) The reviewing court noted that the facts set forth in father's removal motion were essentially undisputed; thus, the question of bias was

10

one of law to be reviewed de novo. (*Id.* at pp. 1563-1564.) It declined to do so, however, because the family court's factual finding regarding bias was "clearly supported by substantial evidence." (*Id.* at p. 1564.) Based on this finding, the *Adams* court concluded the family court abused its discretion when it denied father's motion to remove the evaluator. (*Ibid.*)

As a preliminary matter, it is important to note that Mother did not seek to remove Dr. Simon based on alleged bias; rather, she sought to strike Dr. Simon's written report for a variety of reasons. On this basis alone, Mother's reliance on *Adams* is misplaced. Moreover, *Adams* does not stand for the broad proposition that a court appointed evaluator's failure to adhere to all of the requirements set forth in rule 5.220 requires removal of the evaluator or exclusion of the evaluator's written report, and we decline to so rule.

Mother also relies on *Leslie O. v. Superior Court* (2014) 231 Cal.App.4th 1191 (*Leslie O.*) where an appellate court issued a peremptory writ of mandate, commanding the trial court to issue an order granting mother's request to disqualify the custody evaluator and strike her evaluations. (*Id.* at p. 1213.) In *Leslie O.*, after reviewing the totality of the circumstances, the court determined that the evaluator "stepped outside her role as evaluator to advocate against" mother and help father by, among things, including information unfavorable to mother in her report, while ignoring information unfavorable to father, providing information to father and encouraging him to seek other counsel, and telling father, in effect, that she was on his side and asking him to keep her updated

11

regarding his visitation problems.  (*Id.* at pp. 1205, 1209-1212.)  The circumstances here do not rise to the level of those presented in *Leslie O.* Moreover, in rendering its conclusion, the *Leslie O.* court "caution[ed] that an evaluator whose conduct in one or two respects appears similar to the [e]valuator's conduct here may not need to be removed.  To hold otherwise and thus to endorse appellate micromanagement of every communication or act by the evaluator would make it impossible for evaluators to perform their very difficult and crucial functions."  (*Id.* at p. 1212.)

We review a trial court's ruling on the admissibility of proffered evidence for an abuse of discretion.  (*People v. Rowland* (1992) 4 Cal.4th 238, 264.)  Generally, "[o]nce it is established that a witness has adequate credentials to qualify as an expert, questions as to the degree of his or her expertise go to weight not admissibility."  (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1120-1121.)  For example, the fact a witness did not document all work, took some inaccurate notes or deviated from protocol are all matters going to weight, not admissibility.  (*People v. Cook* (2007) 40 Cal.4th 1334, 1346 [addressing scientific testing of blood].)  Additionally, lapses in professionalism affect only the weight of the evidence.  (*People v. Venegas* (1998) 18 Cal.4th 47, 81 [addressing scientific testing].)

We agree with the family court's conclusion that Mother's objections to the report went to the weight of the report, not its admissibility.  Moreover, Mother's counsel subjected Dr. Simon to extensive cross-examination regarding the report.

12

Ultimately, it was for the family court to assess the credibility of all the witnesses, including Dr. Simon. (*People v. Mercer* (1999) 70 Cal.App.4th 463, 466 [credibility of the experts and their conclusions were matters for trier of fact].) As an appellate court, we do not second-guess such evidentiary assessments. Accordingly, the family court did not err when it refused to strike Dr. Simon's report.

Mother next claims the family court did not apply the correct legal standard in assessing her relocation request, including not (1) considering her presumptive right to move under section 7501, (2) weighing all the *LaMusga* factors, and (3) giving meaningful consideration to Jamison's custodial preference to remain in her care as required by section 3042. We reject these assertions.

While the family court never expressly referred to section 7501 in its statement of decision, this does not support Mother's argument the court was either unaware that Mother had a presumptive right to move under section 7501 or ignored this right. Rather, "[w]e must presume that the court knew and applied the correct statutory and case law" and applied them to the facts in this case. (*Thompson v. Thames* (1997) 57 Cal.App.4th 1296, 1308; *People v. Woods* (1993) 12 Cal.App.4th 1139, 1152 [reviewing court presumes trial court knew and properly applied the law; appellant's burden to rebut presumption by affirmative showing]; see also *Brewer v. Simpson* (1960) 53 Cal.2d 567, 583 [we must adopt all inferences in favor of the judgment].) Moreover, Dr. Simon addressed this right in his report, which the family court considered in rendering its decision.

13

Relying on *F.T. v. L.J.* (2011) 194 Cal.App.4th 1 (*F.T.*), Mother claims the family court improperly focused on Father's relationship with Jamison, to the exclusion of all other *LaMusga* factors, including Jamison's need for continuity and stability with her primary caretaker, Mother. In *F.T.*, the reviewing court found a multitude of errors which revealed the family court did not understand the proper standards to apply in deciding the move away motion, including the following: not addressing the question of which custody arrangement would be in the child's best interests; erroneously requiring the moving parent to show that the planned relocation was necessary; and focusing excessively on the detriment to the child's relationship with the nonmoving parent without considering the detriment to the child's relationship with the relocating parent if the child stayed behind. (*Id.* at pp. 21-26.) On the last issue, the reviewing court remarked that the family court cited only one *LaMusga* factor to the exclusion of all the other *LaMusga* and other relevant factors. (*Id.* at p. 24.)

*F.T.* is distinguishable as the record here shows the family court understood and applied the proper standard when ruling on the motion. First, the family court found that Father met his initial burden of showing the planned move would cause substantial detriment to Jamison. (*LaMusga*, *supra*, 32 Cal.4th at p. 1078.) The family court then properly turned to the issue whether changing Jamison's custody would be in her best interests. In making the best interests determination, the family court recited and addressed the eight *LaMusga* factors and other factors it considered relevant. (*Id.* at p. 1101 [listing eight factors].) "The weight to be

14

accorded to such factors must be left to the court's sound discretion." (*Id.* at p. 1093.)

In its statement of decision, the family court acknowledged that Mother has been the primary caretaker and denying Mother's request to move Jamison to Chico would result in a change of custody and a disruption in the current custody arrangement. Despite these concerns, the trial court found denying the move away request was "clearly in the child's best interests." That the family court found "the factor concerning the ability and willingness of one parent to provide the other parent with the opportunity to spend as much time with the child as possible and to be flexible with scheduling requests as a controlling factor" does not show the family court failed to consider all other factors.

Rather, this case is similar to *LaMusga*. There, the family court "placed 'primary importance' on the effect the proposed move would have on 'what is now a tenuous and somewhat detached relationship with the boys and their father,' concluding that the proposed move would be 'extremely detrimental' to the children's welfare because it would disrupt the progress being made by the children's therapist in promoting this relationship." (*LaMusga*, *supra*, 32 Cal.4th at p. 1093.) The Court of Appeal concluded that the family court abused its discretion because it did not take into account the " 'paramount need for stability and continuity in the existing custodial arrangement. Instead, it placed undue emphasis on the detriment that would be caused to the children's relationship with Father if they moved.'" (*Ibid.*) Our high court disagreed with the Court of Appeal

as there was "nothing in the record . . . that indicate[d] that the superior court failed to consider the children's 'interest in stable custodial and emotional ties' with their mother."  (*Ibid.*)

Here too, the family court's emphasis on the respective attitude of each parent regarding visitation with the other parent does not demonstrate an abuse of discretion.  Significantly, Mother does not challenge the sufficiency of the evidence supporting the family court's findings that the relationship between Father and Jamison "would certainly run a high risk of being greatly diminished if the request to move to Chico [were] granted" and it was "Father and not . . . Mother who [would] encourage an ongoing relationship between the absent parent" and Jamison.

Finally, Mother asserts the family court failed to give meaningful consideration to Jamison's custodial preference to remain in her care as required by section 3042.  We disagree.

Section 3042 requires a court to "consider" and give "due weight" to the wishes of children who are of "sufficient age and capacity to reason so as to form an intelligent preference as to custody or visitation" when making or modifying a custody and visitation order.  In its statement of decision, the family court stated that although it declined to permit Jamison to be called as a witness, "[t]here [was] no question that Jamison has expressed the desire to move with her Mother to Chico, California.  To have the minor child testify in the Court's opinion would only cause emotional distress which is not necessary.  Both sides agree that

16

Jamison would testify that she would like to move to Chico, California with her Mother." This statement shows the family court considered Jamison's wishes. That the family court did not follow Jamison's wishes does not establish an abuse of discretion.

Moreover, while Dr. Simon admitted his report did not address risks to Jamison if she were placed with Father, he testified these risks included Jamison "not adjust[ing] to the move, becom[ing] depressed, withdrawn, sullen, angry. There is a risk that she becomes angry with her father, blames her father for her not being able to go with her mother, and distances herself from her father and starts to pull back from that relationship." Nonetheless, Dr. Simon concluded the greatest risk to Jamison was losing the relationship with Father. After hearing from Dr. Simon and the parents, the family court found that granting the move away request would risk greatly diminishing Jamison's relationship with Father and this amounted "to a serious detriment to the child which [could not] be overcome." In making its order, the family court acknowledged emotional concerns regarding Jamison, but found "Father [would] work hard to alleviate those issues and to make sure that [Jamison had] ongoing, continued contact with . . . Mother." In making its order, the family court applied the proper criteria and a reasonable basis existed on which the court could conclude its decision advanced Jamison's best interests. (*In re Marriage of Burgess* (1996) 13 Cal.4th 25, 32.) We cannot reweigh the evidence. (*LaMusga*, *supra*, 32 Cal.4th at p. 1093.)

17

## II. *Attorney Fees*

### A. Background

In late May 2013, the family court ordered that Father pay $44,407 to Mother's counsel for fees and costs under sections 2030 and 2032, finding that the parties had disparate incomes and that Father had the ability to contribute to Mother's fees and costs. In July 2013, Mother made an ex parte request for attorney fees alleging, among other things, that Father had provided ex parte documents to Dr. Simon and had lied about it in discovery and had personally obstructed service of a deposition subpoena on one of his trial witnesses. At that time, she owed counsel $47,825. The family court denied the request stating, "Inappropriate ex parte issues. These are trial issues. Evidence to be presented if admissible at trial."

In August 2013, Mother moved for an award of fees and costs, stating she currently owed her counsel $65,542. Later that month, she submitted an ex parte motion requesting an award of attorney fees to seek a writ or an appeal. In October 2013, as part of her motion to modify custody and spousal support, Mother requested for a further award of attorney fees as she owed counsel $146,936. In February 2014, Mother sought a fee award of about $155,195 for past services provided from May 3, 2013 through January 31, 2014.

At a hearing in February 2014, the court denied all of the above requests. In so ruling, the court made the following findings: the litigation has been ongoing since 2003 and the matter has been "heavily litigated" at almost every juncture;

18

Father had previously contributed $69,000 for Mother's fees which the court considered to be a "very significant" contribution; additional fees at this juncture was neither reasonable nor possible as Father lacked the income to sustain himself and the minor child given the cost of this litigation thus far; and that both "parties have now worked themselves into a position where neither one of them can afford to retain counsel."

B.  Analysis

Under sections 2030 and 2032, a family court may award attorney fees and costs "between the parties based on their relative circumstances in order to ensure parity of legal representation in the action." (*In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 974.)  The parties' circumstances include assets, debts and earning ability of both parties, ability to pay, duration of the marriage, and the age and health of the parties.  (*In re Marriage of Duncan* (2001) 90 Cal.App.4th 617, 630.)  In addition to assessing need and ability to pay, the family court may consider the other party's trial tactics.  (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1313-1314.)  The family court has broad discretion in ruling on a motion for fees and costs; we will not reverse absent a showing that no judge could reasonably have made the order, considering all of the evidence viewed most favorably in support of the order.  (*In re Marriage of Sullivan* (1984) 37 Cal.3d 762, 768-769.)

Mother contends the denial of any need-based attorney fees constituted an abuse of discretion particularly given Father's litigation tactics.  She also asserts

the court's finding that "'neither one of [these parties] can afford to retain counsel'" is not supported by the evidence given Father's demonstrated ability to pay his fees in full each month. Based on the record, we find substantial evidence supported the court's finding and, considering all of the evidence, the court's ruling did not constitute an abuse of discretion.

The record reveals that both parties incurred extensive attorney fees in the dissolution proceeding and instant move away request. Mother already paid $107,750 for fees and costs and still owed $155,195 for past fees and costs. Father has paid about $156,804 in fees through December 31, 2013, and $69,407 of Mother's fees. As of May 17, 2013, Father was current on his legal expenses.

Mother's May 2013 income and expense declaration indicated that, other than spousal support, she had no income, minimal assets and that her expenses exceeded her income. A vocational evaluator concluded that Mother's earning capacity was $10 to $15 per hour or $32,300 to $43,300 per year. Although Mother was advised to become employed, she had not obtained employment.

Father filed an income and expense declaration in May 2013 and a financial report prepared by a financial analyst in February 2014. The financial report revealed that Father's 2013 annual cash flow was $524,543; however, after expenses, his annual net income was negative ($92,621) and he carried $1,586,409 of debt. Father's total net worth was about $1,534,000, of which $1,500,000 was in tax deferred retirement accounts and the remainder in illiquid real estate. The financial analyst concluded that Father did "not have the financial means to meet

20

the long term obligations of his business and personal finances and is in need of significant debt restructuring to avoid bankruptcy."

This evidence revealed that both parties have considerable indebtedness and, although Father clearly has greater income than Mother, he also has greater expenses. As the family court aptly found, while there "appear[ed] to be a disparity of income," neither party could afford to retain counsel. Thus, Father's past ability to pay counsel is not reflective of his current circumstances. Moreover, while Mother complained of Father's litigation tactics below, the family court did not address this issue in its ruling and presumably rejected the argument. On this record, the family court did not abuse its discretion in denying Mother's request for an award of fees and costs.

### III. *Conclusion*

The parties have litigated to the point of financial ruin, to their own detriment and, more importantly, the detriment of their daughter. While Mother clearly disagrees with the family court's conclusions, she failed to show the court committed error in making its findings and we cannot reweigh the evidence. We acknowledge the change in custody will pose challenges to all parties and echo the family court's reliance that both parents will support the court's order and "do everything possible to not cause any more emotional stress on their daughter" and that Mother will "avoid[] engaging Jamison negatively with regard to her Father and the order of the Court."

21

DISPOSITION

The orders are affirmed.  In the interests of justice, each party will bear his or her own costs on appeal.

_____
McINTYRE, J.

WE CONCUR:

_____
BENKE, Acting P. J.

_____
NARES, J.

22

Filed 3/27/15

CERTIFIED FOR PUBLICATION

COURT OF APPEAL - STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION ONE


TAMI L. WINTERNITZ,
Appellant.
v.
WILLIAM W. WINTERNITZ, JR.,
Respondent,
**D065131**
**San Diego County No. D536848**



THE COURT:

      The opinion in this case filed February 27, 2015 was not certified for publication. It appears the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c). The Association of Certified Family Law Specialist's request pursuant to California Rules of Court, rule 8.1120(a) for publication is GRANTED.

      IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

      ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.


                                McINTYRE, Acting P. J.

cc: All Parties