Filed 7/9/15  Marriage of Feldman & Dubin CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FIVE

| | |
|---|---|
| In re MARRIAGE of CLIFF FELDMAN and MARGARET DENISE DUBIN. | |
| CLIFF FELDMAN,<br><br>        Respondent,<br><br>v.<br><br>MARGARET DENISE DUBIN,<br><br>        Appellant. | A139819<br><br>(Alameda County<br>Super. Ct. No. RF10521580) |

Appellant Margaret Denise Dubin (Mother) appeals from the trial court's judgment awarding respondent Cliff Feldman (Father) joint legal and physical custody over their two children.  We affirm.

### BACKGROUND

Mother and Father married in October 2002.  They have two sons, one born in 2003 and one born in 2006.  The parties agree their marriage was characterized by ongoing conflict, although they largely blame each other.

On June 22, 2010, Father filed a petition for dissolution of marriage (Petition).  Earlier that month, during the evening of June 9, Mother and Father engaged in an argument that ultimately resulted in Father striking Mother in the buttocks with a wooden clothes hanger, which resulted in a bruise.  On the evening of June 11, following another conflict, Father called the police after Mother left their home with their children.  The

1

police ended up arresting Father after Mother showed them the bruise caused by the hanger. An emergency protective order was issued, directing Father to stay away from and not contact Mother and the children until June 18. Mother declined to cooperate with any criminal proceeding against Father. Father spent the night in jail, but no charges against him were filed.

In his Petition, Father requested joint legal and physical custody. In July 2010, Mother obtained a temporary restraining order (TRO), directing him to stay away from her and awarding her sole legal and physical custody pending a hearing. Father was awarded limited visitation. In his opposition to the TRO, Father admitted losing his temper and "swat[ting]" Mother on the buttocks with a hanger. In September, the parties stipulated to an order that, among other things, directed Father to stay away from Mother, gave Father visitation with the boys on alternating Tuesday and Wednesday nights and every other weekend, and required both parents to take the children to their extracurricular activities.

In August 2011, Father moved for modification of the September 2010 order. Among other things, he requested joint legal and physical custody of the children. The parties met with the court's mediator and, in October, the trial court adopted the mediator's recommendations to, among other things, leave sole legal and physical custody with Mother, while increasing Father's visitation by adding Sunday nights to his weekends. In addition, the court ordered the parties to obtain a child custody evaluation.

Dr. Randy Kolin conducted the custody evaluation and issued his report and recommendations in May 2012. The evaluation included meetings with both parties, the children, and various collateral witnesses. Dr. Kolin also reviewed documents submitted by the parties, as well as videotapes and voicemail messages provided by Father. Dr. Kolin recommended, among other things, that the trial court order that the parents have joint legal and physical custody over the children.

In May 2012, Father filed a declaration indicating his general agreement with Dr. Kolin's recommendations. Mother filed a declaration objecting to the recommendations for joint legal and physical custody. At a hearing in September 2012, the trial court

scheduled October trial dates on the custody issue. At that hearing, the court also reaffirmed prior orders requiring the parents to take the children to all their extracurricular activities. Mother expressed great reluctance to do so.

The trial was conducted over three days in October 2012 and three days in January 2013. The trial court received documentary evidence and heard from a number of witnesses, including Dr. Kolin. Father's witnesses included the Director of Recreation for the City of Piedmont, the children's school counselor, a former friend of Mother's, a family friend, and Mother's neighbor. Mother's witnesses included an expert on domestic violence, Father's former supervisor with the City of Oakland, and a former counselor for the children.[1]

The trial court filed a tentative decision in April 2013 and, after considering objections from Mother, filed a statement of decision (Decision) in July. The court largely agreed with Dr. Kolin's recommendations, awarding the parents joint legal and physical custody. Also, among other orders, the court directed that Father has authority to determine the children's extracurricular activities in the event of a disagreement between the parents. In August, the court entered judgment in accordance with its Decision.

## DISCUSSION

"We review custody and visitation orders for an abuse of discretion, and apply the substantial evidence standard to the court's factual findings. [Citation.] A court abuses its discretion in making a child custody order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child. [Citation.] A court also abuses its discretion if it applies improper criteria or makes incorrect legal assumptions." (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497, italics omitted.) Mother contends the trial court's judgment must be reversed because the child custody evaluation was flawed and biased, the judgment was based on inadmissible

---

[1] The evidence presented at trial is summarized as appropriate in the discussion section of this opinion.

3

videotapes, the court failed to apply the Family Code section 3044[2] presumption against joint custody, and there was no basis to give Father authority over the children's extracurricular activities.  Mother has failed to demonstrate reversible error.

I.      *The Child Custody Evaluation Was Not Inadmissible*

"Because 'the results of an independent evaluation generally are given great weight by the judge in deciding contested custody . . . issues, the Judicial Council has adopted rules of court establishing uniform standards of practice for court-ordered custody evaluations.' [Citation.]  California Rules of Court, rule 5.220 governs child custody evaluators appointed under section 730 and requires them to '[m]aintain objectivity, provide and gather balanced information for both parties, and control for bias.' (Cal. Rules of Court, rule 5.220(h)(1).)" (*In re Marriage of Adams & Jack A.* (2012) 209 Cal.App.4th 1543, 1563 (*Adams*).)  Mother contends the trial court erred in relying on Dr. Kolin's custody evaluation because Dr. Kolin was biased, because he failed to file a form attesting to certain educational requirements, and because his report and evaluation failed to address various matters.[3]

"We review a trial court's ruling on the admissibility of proffered evidence for an abuse of discretion.  [Citation.]  Generally, '[o]nce it is established that a witness has adequate credentials to qualify as an expert, questions as to the degree of his or her expertise go to weight not admissibility.' [Citation.] . . . Additionally, lapses in professionalism affect only the weight of the evidence." (*In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 653 (*Winternitz*).)  It is the responsibility of the family court to assess the credibility of all witnesses, including expert witnesses like Dr. Kolin.  (*Ibid*.)

    A.      *Bias*

Mother contends Dr. Kolin's evaluation should have been disregarded because he was biased against her.

---

[2] All undesignated section references are to the Family Code.
[3] Mother has not cited to portions of the record demonstrating that she objected to the admission of Dr. Kolin's report on the grounds asserted on appeal.  Absent such objections, her claims have been forfeited on appeal. (*People v. Farnam* (2002) 28 Cal.4th 107, 153.)  In any event, as explained herein, her claims are without merit.

The cases cited by Mother are distinguishable. In *Adams*, *supra*, 209 Cal.App.4th 1543, the court concluded a custody evaluator should have been removed where the trial court found the evaluator had "lost his objectivity." (*Id.* at p. 1564.) Among other things, the evaluator made "ex parte communications to mother's counsel and the court, and imposed an escalating series of accusatory demands on [the] father" at the mother's request. (*Id.* at p. 1565.) When the father moved for removal of the evaluator, the evaluator refused, "forbade father and his counsel from contacting him, and proceeded to write a biased report." (*Ibid.*) In *Rand v. Board of Psychology* (2012) 206 Cal.App.4th 565 (*Rand*), a psychologist was disciplined for unprofessional conduct while acting as special master regarding visitation and other matters in a divorce proceeding. (*Id.* at pp. 568–569.) The evidence showed the psychologist "met with and talked freely with" the father and his attorney, but "had minimal contact with [the mother] and refused to communicate with her attorney." (*Id.* at p. 583.) "Early in his tenure as special master," the psychologist told the mother "he no longer trusted her and informed her she would have to corroborate everything to him. [The psychologist] emailed [her] that he could not work with dishonesty and incorrectly accused her of perjury." (*Id.* at p. 569.)

Nothing comparable occurred in the present case. Mother asserts Dr. Kolin "became frustrated with [her] and called her a liar just hours before submitting his report to the court." However, in his testimony Dr. Kolin recalled that he asked her to be "honest" and "to take responsibility for some of the behavior" he saw.[4] In any event, the interaction described by Mother is not comparable to what occurred in *Adams* and *Rand*,

---

[4] At trial, Mother asked Dr. Kolin, "Do you recall accusing me of lying?" He responded, "I don't know if I accused you specifically. I'm sure that [is] your recollection, it may be a bit favorable to your experience of this phone call." He went on to say that during the phone call, he asked her about her role in an incident at the City of Piedmont pool, which resulted in her being barred from swimming there. He explained, ". . . I was asking you to be honest and tell me what your role was. So maybe I did say, by asking you to be honest, am I saying you're a liar? You can construe it that way. But I'm asking you to take responsibility for some of the behavior I saw." Dr. Kolin also acknowledged accusing Mother of "talking out of both sides" of her mouth, in relation to certain complaints about Father.

where the evidence showed the psychologists repeatedly refused to equitably engage with one of the parents. (*Adams*, *supra*, 209 Cal.App.4th at pp. 1564–1565; *Rand*, *supra*, 206 Cal.App.4th at pp. 569, 583.) Neither has Mother demonstrated any other sustained inequitable treatment indicative of bias. To the extent Mother contends Dr. Kolin's report treated Mother's and Father's concerns and allegations in disparate ways, that was a matter for the trial court to consider in deciding what weight to give to the report. (*Winternitz*, *supra*, 235 Cal.App.4th at p. 653.)

Mother also argues Dr. Kolin failed to disclose that he is a "proponent of and nationally recognized speaker for the 'Parental Alienation Syndrome,' " which she describes as a "medically discredited syndrome [that] has been employed to give custody to parents who have been accused of abusing their children or spouses." At trial, Dr. Kolin admitted speaking at a conference regarding the syndrome and acknowledged it was not on his resume, but denied he was an expert on the syndrome. Dr. Kolin also admitted to having attended meetings of the National Child Abuse Defense and Resource Center. Dr. Kolin testified that organization puts on conferences regarding "science that can be used in cases of defending people that are accused of child abuse." Mother contends these affiliations were conflicts of interest that Dr. Kolin was obligated to disclose under rules 5.225(l)(6) and 5.220(h)(10) of the California Rules of Court[5] and a bias he was required to disclose under rule 5.220(h)(6), which refers to "any limitations or bias that would affect the evaluator's ability to conduct the evaluation." We disagree. Mother has not demonstrated that parental alienation syndrome or child abuse were relevant in the present proceeding. Neither has Mother presented any authority that attendance at meetings is a sufficient basis to support a finding of a bias or conflict of interest that must be disclosed under the rules. Finally, Mother has not demonstrated any undisclosed affiliations are a basis for reversal, rather than a factor to be considered by the trial court in its assessment of the evaluator's recommendations. (*Winternitz*, *supra*, 235 Cal.App.4th at p. 653.)

---

[5] All further rules references are to the California Rules of Court.

The trial court did not err in failing to remove Dr. Kolin as evaluator or in relying on Dr. Kolin's report.

B.      *Qualifications and Content of Report*

Rule 5.225(e) requires child custody evaluators to comply with "the basic and advanced domestic violence training requirements described in rule 5.230." Mother points out that, "[d]uring the trial, it was revealed that Dr. Kolin had not filed the requisite form Family Law Form FL-326, 'Declaration of Private Child Custody Evaluator Regarding Qualifications,' which verifies his completion of" those requirements. Rule 5.225(l)(3)(B) required Dr. Kolin to complete that form and file it with the court "no later than 10 days after notification" of the appointment and commencement of work.

At trial, Dr. Kolin admitted that, although it was his practice to do so, he could not find evidence that he filed the required form. However, he testified he met all the required educational requirements. Mother asserts his testimony was "evasive," but we do not perceive any ambiguity in Dr. Kolin's testimony that he was in compliance with the training requirements. Neither does Mother present any authority that Dr. Kolin's failure to file form FL-326 affected the admissibility of his testimony. Instead, his failure to file the form was a matter the court could take into consideration in weighing his testimony and recommendations. (*Winternitz*, *supra*, 235 Cal.App.4th at p. 653.) Mother has demonstrated no error arising from the qualification requirements.

Mother also contends Dr. Kolin's report was inadequate in various respects. She argues he failed to provide information about the parties' personal and work histories; to "conduct a domestic violence risk assessment"; to give sufficient weight to an incident during which Father allegedly threatened his supervisor at work;[6] and to give sufficient

---

[6] Father's former supervisor testified it was alleged that Father threatened to kill her and asked for her home address. Although the supervisor was not present, her understanding is that Father was removed from the building and put on "administrative leave" for two or three weeks.

7

weight to the psychological tests administered to the parents.[7] She also argues Dr. Kolin failed to interview various relevant witnesses, including the psychologist who had been treating Father and one of the therapists who treated the children. Finally, she argues Dr. Kolin did not adequately consider the children's best interests in recommending a co-parenting arrangement. However, Mother cites to no authority that these alleged failings rendered Dr. Kolin's report *inadmissible*. To the contrary, these were all matters the trial court could properly consider in deciding what weight to give Dr. Kolin's report and recommendations. (*Winternitz*, *supra*, 235 Cal.App.4th at p. 653.)

Mother has not demonstrated any reversible error arising from Dr. Kolin's involvement or performance in the proceedings below.[8]

II.     *Mother Has Not Shown The Videos Taken by Father Were Inadmissible*

The trial court admitted into evidence videos taken by Father during arguments with Mother. The court relied in part on the videos in concluding that Mother had perpetrated domestic violence against Father. Mother contends the trial court erred in admitting the videos under section 632 of the Penal Code. She is mistaken.

---

[7] Dr. Kolin's testing indicated that Father is "prone to be hostile, tense, and agitated when threatened or trapped"; he may "project his angry feelings and aggressive impulses onto others"; "[w]hen stressed or emotionally threatened, he could pursue his self interests in urgent or even forceful ways"; his "general potential for antisocial behavior is somewhat above average"; there is a "mild risk for serious problematic reaction if he were to be strongly provoked"; and there is a "serious risk of loss of control over his temper." Dr. Kolin's testing also found that Mother possessed a number of problematic personality traits.

[8] In a related series of contentions, Mother contends the trial court's Decision is flawed because it overly relies on Dr. Kolin's report; contains no mention of Dr. Kolin's alleged bias and failure to file form FL-326; and fails to discuss the testimony of Mother's expert witness on domestic violence and other evidence favorable to Mother. Mother fails, however, to cite any authority that the Decision is reversible on those grounds. We reject Mother's contention that the court based its findings "solely on conclusions reached by a child custody evaluator." (§ 3044, subd. (e).) We also reject any suggestion that the requirement that the trial court "consider any relevant, admissible evidence submitted by the parties" (*ibid.*) means that the court must specifically discuss all such evidence in its statement of decision.

8

Penal Code section 632, subdivision (a) provides in relevant part, "Every person who, intentionally and without the consent of all parties to a confidential communication, by means of any electronic amplifying or recording device, eavesdrops upon or records the confidential communication . . . shall be punished by a fine not exceeding two thousand five hundred dollars ($2,500), or imprisonment in the county jail not exceeding one year, or in the state prison, or by both that fine and imprisonment."  Penal Code section 632, subdivision (c) defines a " 'confidential communication' " as including "any communication carried on in circumstances as may reasonably indicate that any party to the communication desires it to be confined to the parties thereto, but excludes a communication made in a public gathering or in any legislative, judicial, executive or administrative proceeding open to the public, or in any other circumstance in which the parties to the communication may reasonably expect that the communication may be overheard or recorded."

In the present case, Mother cites no evidence that any of the videos at issue were obtained by eavesdropping; it is clear in the videos reviewed by this court that Mother was aware Father was recording her.  Thus, Mother has not demonstrated the videos were obtained in violation of Penal Code section 632.  Neither has Mother demonstrated any other basis for exclusion of the videos.  Mother has not shown error.

III.    *Any Error With Respect to the Section 3044 Presumption Was Harmless*

Section 3044, subdivision (a) provides, "Upon a finding by the court that a party seeking custody of a child has perpetrated domestic violence against the other party seeking custody of the child or against the child or the child's siblings within the previous five years, there is a rebuttable presumption that an award of sole or joint physical or legal custody of a child to a person who has perpetrated domestic violence is detrimental to the best interest of the child, pursuant to Section 3011.  This presumption may only be rebutted by a preponderance of the evidence."  Section 3011, subdivision (b) provides that "[a]ny history of abuse by one parent or any other person seeking custody" is a factor that "shall" be considered "[i]n making a determination of the best interest of the child."

9

Section 3044, subdivision (b) specifies a number of factors that the court "shall consider" in determining whether the presumption has been overcome, including whether the perpetrator of the violence (1) has demonstrated that custody is in the "best interest of the child"; (2) has successfully completed a "batterer's treatment program"; (3) has completed alcohol or drug abuse counseling where "appropriate"; (4) has completed any parenting class where "appropriate"; (5) is on probation or parole; (6) is "restrained by a protective order or restraining order, and whether he or she has complied with its terms and conditions"; and (7) has "committed any further acts of domestic violence."

In its decision, the trial court found that both Mother and Father had "perpetrated acts of domestic violence" within the meaning of section 3044, subdivision (a). In particular, Father "admitted hitting [Mother] with a hanger on her buttocks and causing a bruise on June 9, 2010." The court further found "that the evidence produced at trial was insufficient to prove any other acts of physical abuse" by Father towards Mother. In regard to Mother, the court found based on the testimony, videos, and other evidence that she "engaged in behavior involving, but not limited to, threatening, harassing and/or disturbing the peace of [Father] for which a court may issue an ex parte order pursuant to Section 6320 to protect the other party seeking custody of the children."[9] (Italics omitted.) The court described Mother's behavior as "aggressive, threatening, harassing, angry, belittling, raging, provocative, [and] intimidating." Based on those findings "that each party has perpetrated domestic violence upon the other party," the court "decline[d] to impose the presumption of Section 3044(a) in this matter under these circumstances." (Italics omitted.)

---

[9] Section 3044, subdivision (c) provides: "For purposes of this section, a person has 'perpetrated domestic violence' when he or she is found by the court to have intentionally or recklessly caused or attempted to cause bodily injury, or sexual assault, or to have placed a person in reasonable apprehension of imminent serious bodily injury to that person or to another, or to have engaged in any behavior involving, but not limited to, threatening, striking, harassing, destroying personal property or disturbing the peace of another, for which a court may issue an ex parte order pursuant to Section 6320 to protect the other party seeking custody of the child or to protect the child and the child's siblings."

10

Mother contends the trial court erred in declining to apply the section 3044 presumption against Father. She argues there was insufficient evidence supporting the court's finding she perpetrated domestic violence within the meaning of section 3044, subdivision (c). Mother also appears to argue that, even assuming there was sufficient evidence to support the finding against her, the court was obligated to impose the section 3044 presumption against Father because the evidence showed he was the "dominant aggressor."

There are legitimate questions as to whether the conduct evidenced by Mother constitutes domestic violence within the meaning of section 3044, subdivision (c). (See *S.M. v. E.P.* (2010) 184 Cal.App.4th 1249, 1265–1266 ["badgering" behavior does not support issuance of a section 6320 restraining order]; *In re Marriage of Nadkarni* (2009) 173 Cal.App.4th 1483, 1497 [" 'disturbing the peace' " is "conduct that destroys the mental or emotional calm of the other party"].) Moreover, although the plain language of section 3044 does not support Mother's apparent contention that the presumption only applies against the "dominant aggressor," neither does the plain language of the statute support the trial court's conclusion that no presumption applies where both parents have perpetrated domestic violence. The court's interpretation would frustrate the purpose of the statute to protect children in a situation where both parents were perpetrators of serious and pervasive domestic violence.

We need not, however, decide whether the finding against Mother is supported by the evidence or which construction of the statute is proper. That is because, even assuming the trial court erred in failing to require Father to overcome the section 3044 presumption—either because there was no basis for the finding against Mother or because the court's decision not to impose the presumption was based on an erroneous interpretation of the statute—the error was harmless. "Before any judgment can be reversed for ordinary error, it must appear that the error complained of 'has resulted in a miscarriage of justice.' (Cal. Const., art. VI, § 13.) Reversal is justified 'only when the court, "after an examination of the entire cause, including the evidence," is of the "opinion" that it is reasonably probable that a result more favorable to the appealing party

11

would have been reached in the absence of the error.' [Citations.] A reasonable probability for these purposes does not mean an absolute probability; the likelihood that the error affected the outcome need not be greater than the likelihood that it did not. [Citation.] The test is satisfied, and prejudice appears, if the case presents 'an equal balance of reasonable probabilities.' " (*In re J.S.* (2011) 196 Cal.App.4th 1069, 1078–1079 (*J.S.*).)

This "rule of harmless error" (*J.S.*, *supra*, 196 Cal.App.4th at p. 1078) applies to errors involving the failure of a lower court to comply with a statutory directive, such as the alleged error in the present case. (See, e.g., *In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 304 [court's failure to comply with statutory directive to consider whether placement with noncustodial parent would be detrimental to children was not prejudicial]; *In re Abram L.* (2013) 219 Cal.App.4th 452, 463 [court's failure to consider whether placement with noncustodial parent would be detrimental was prejudicial because more favorable outcome was "reasonably probable"]; *In re Nickolas T.* (2013) 217 Cal.App.4th 1492, 1507–1508 [court's error in selecting unauthorized permanent plan at disposition hearing not prejudicial]; *J.S.*, at p. 1079 [court's failure to make express finding regarding whether to retain jurisdiction over child not prejudicial].)

The court in *Keith R. v. Superior Court* (2009) 174 Cal.App.4th 1047, explained the appropriate analysis under section 3044. A finding that the section 3044 presumption applies "changes the burden of persuasion as to the best interest test, but it does not limit the evidence cognizable by the court, and it does not eliminate the best interest requirement." (*Keith R.*, at p. 1054.) "The minor child's best interests must remain at the forefront of the family court's considerations on custody in determining whether the section 3044 presumption has been rebutted." (*Id.* at p. 1056.) "The section 3044 presumption . . . does not change the best interest test, nor supplant other Family Code provisions governing custody proceedings. This presumption may be overcome by a preponderance of the evidence showing that it is in the child's best interest to grant joint or sole custody to the offending parent. (§ 3044, subd. (b)(1).) Nor does the statute establish a presumption for or against joint custody; again, the paramount factor is the

child's health, safety and welfare. [Citations.] And where the section 3044 presumption has been rebutted, there is no statutory bar against an award of joint or sole custody to a parent who was the subject of the order." (*Keith R.*, at p. 1055; accord *F.T. v. L.J.* (2011) 194 Cal.App.4th 1, 27.)

Keeping those principles in mind, it is not reasonably probable the outcome would have been more favorable to Mother had the trial court imposed the section 3044 presumption against Father. The Decision contains detailed and firm findings that it was in the children's best interest for the parents to share custody. The court found the children love each parent, have a "close bond" with each parent, and "wish to spend more time with" Father. Each parent loves the children "deeply" and "consider[s] parenting their children a priority in life." The Decision continues, "Each parent has different strengths and weaknesses in their parenting abilities. [The children] each benefit by the parenting strengths of each parent." Although the strained parental relationship is a significant obstacle to effective co-parenting, the living and schooling arrangements are conducive to shared parenting. The Decision expressed concerns about Father's behavior and personality, but also expressed equally strong concerns about Mother's behavior and personality.[10]

As noted previously, section 3044, subdivision (b) specifies a number of factors that the court "shall consider" in determining whether the presumption has been overcome. The trial court's Decision expressly addressed the children's best interest (§ 3044, subd. (b)(1)) and whether the evidence showed Father "committed any further acts of domestic violence" (§ 3044, subd. (b)(7)). Mother has cited no evidence showing a likelihood the trial court would have found it "appropriate" that Father undergo alcohol or drug abuse counseling (§ 3044, subd. (b)(3)) or complete a parenting class (§ 3044, subd. (b)(4)), and there is no evidence Father is on probation or parole (§ 3044, subd. (b)(5)). The trial court had evidence before it regarding Father's conduct while subject to

---

[10] The trial court witnessed some of Mother's problematic behavior at trial. For example, during Father's presentation of the testimony of a former friend of Mother's, Mother demonstrated a lack of self control by using profanity in stating a relevance objection.

13

the temporary restraining order and the stipulated stay away order (§ 3044, subd. (b)(6)), and there is no basis to conclude the court's determination would have changed had it expressly considered that circumstance in the context of the section 3044 presumption. Similarly, although there is no indication Father completed a "batterer's treatment program" (§ 3044, subd. (b)(2)), there is no basis to conclude that factor would have affected the trial court's determination of the children's best interest, in light of its express finding that only the incident admitted by Father was proven by the evidence.

The Decision makes it plain the trial court strongly believed joint custody was the best arrangement for the children and that it had equal concerns about both parents' behavior. It is not reasonably probable the trial court would have found Father failed to overcome the section 3044 presumption. Thus, any error in failing to impose the presumption against Father was harmless.

IV.     *The Trial Court Did Not Abuse Its Discretion Regarding Extracurriculars*

In its Decision, the trial court granted Mother and Father joint legal custody over the children, but it directed that "decisions regarding [the children's] participation in extracurricular activities, including sports, or any other program that would regularly involve [the children] in any activity that would occur during both parents' periods of custodial access . . . shall be made by [Father] in the event that the parties are unable to agree . . . ." (Emphasis omitted.) On appeal, Mother contends the record does not support the court's decision to give Father authority over extracurricular activities.

In support of its determination to give ultimate authority over extracurricular activities to one parent, the Decision found it was in the children's best interest to be involved in team sports activities and the children "should not be stressed over what extracurricular activities they participate in during the year." The Decision explained, "[t]he boys need to develop a healthy support system for themselves independently of their parents, they seem to have this with their extracurricular activities and their school." The Decision also emphasized Dr. Kolin's statement, "As far as custody conflicts go, this one is perhaps the most or one of the most conflictual custody evaluations I have conducted in over ten years. The parents rarely agree on anything. There is no such

14

thing as a simple e-mail between these parents regarding almost everything." (Emphasis omitted.) Finally, the Decision referenced incidents during which Mother expressed reluctance about the children's extracurricular activities, pointing out, "[Mother] has written a number of emails implying and directly saying she will not take the boys to all scheduled activities on her weekends, as she may choose to do something different with them on her time."

Mother argues there was no evidence she regularly failed to bring the children to extracurricular activities; Father "used the children's extracurricular schedule to harass and control [Mother] by enrolling the children in an excessive number of soccer activities that effectively excluded any and all other activities, including homework and rest"; and Father "used his authority to attend extracurricular events—in particular, sporting events—during [Mother's] custodial time to harass her and to gain access to the children." However, the trial court was not obligated to accept Mother's characterization of the evidence in those respects.

In light of the evidence showing the importance of extracurricular activities to the children, the problems Mother and Father have with joint decision making, and Mother's reluctance about fully committing to the children's extracurricular activities, the trial court did not abuse its discretion in granting ultimate authority to one parent and in deciding Father was the more appropriate parent to hold that authority.[11]

DISPOSITION

The trial court's judgment is affirmed. Father is awarded his costs on appeal.

---

[11] We recognize that a joint legal custody arrangement between parents who are so prone to conflict presents significant challenges. The record reflects that disagreements over extracurricular activities were one of the main sources of ongoing conflict between the parents. It appears the trial court sought to mitigate the difficulties inherent in the joint legal custody arrangement by giving one parent decision making authority over that area of disagreement.

_____

SIMONS, J.

We concur.

_____

JONES, P. J.

_____

NEEDHAM, J.

(A139819)