Filed 10/26/23  In re R.W. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re R.W., a Person Coming Under the Juvenile Court Law. | D082113 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>J.H.,<br><br>Defendant and Appellant. | (Super. Ct. No. J521132) |

APPEAL from orders of the Superior Court of San Diego County, Alexander M. Calero, Judge.  Affirmed.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Evangelina Woo, Deputy County Counsel, for Plaintiff and Respondent.

J.H. (Mother) appeals from the juvenile court's exit order and termination of dependency jurisdiction under Welfare and Institutions Code[1] section 361.2, subdivision (b)(1) and the dispositional findings and orders made under section 361.5. She argues (1) the court abused its discretion in terminating jurisdiction of her son R.W., (2) she should have been granted reunification services, and (3) the court abused its discretion in granting Father sole legal custody. We disagree and affirm the court's findings and orders.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *Referral and the Agency's Initial Investigation*

In October 2022, the San Diego County Health and Human Services Agency (Agency) received a referral regarding 14-year-old R.W. R.W. was found on the side of the road with numerous cuts and bruises and was visibly distraught. He had red lines that appeared to be rope burns around his neck, wrists, and ankles.

R.W. reported that Mother's boyfriend had tied him up, assaulted him, poured liquid from a gas can on him and threatened to burn him. R.W. screamed for help, but no one heard him. While Mother's boyfriend was gone, R.W. freed himself, ran to a truck and tried to start it. Mother's boyfriend returned with a baseball bat, located R.W., smashed the truck's window, and dragged R.W. out of the truck. R.W. grabbed the baseball bat to avoid being hit and they both struggled for it. Mother appeared and she helped her boyfriend pull R.W.'s hair to force R.W. to let go of the bat. When R.W. let go, the bat hit Mother's knee. Mother's boyfriend slammed R.W. onto a flat

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise noted.

platform before R.W. got up and ran away, while the boyfriend screamed at R.W. to get off his property.

R.W. escaped to the main roadway and sought help from a passerby. As R.W. was being evaluated by paramedics, Mother approached. She had a visible bruise above her left knee and immediately told an officer that R.W. was lying, and that he hit her with a bat and damaged the truck. When the officer asked Mother about her boyfriend, she immediately changed the subject and complained about R.W., accusing him of acting out so she and her boyfriend would get in trouble. She initially denied R.W. had any injuries and then claimed they were self-inflicted.

The officer found R.W.'s statements of the incident to be "credible," that his injuries "support[ed] his version of the event," and that Mother "had a far less plausible story." She "seemed evasive when asked specific questions about the current incident or her boyfriend" and was "noticeably defensive anytime [the officer] ask[ed] an investigative question." The officer "concluded it was more likely than not, a child abuse incident" had occurred.

R.W. was transported to the emergency room, where a doctor determined he had a broken wrist and multiple abrasions all over his body. A child abuse expert reviewed his injuries and his account of the events, and concluded this was "consistent with physical and psychological abuse." Mother, along with a law enforcement officer and the maternal uncle, created a safety plan whereby R.W. was released to the maternal uncle and step-grandmother's care once he was discharged from the hospital.

Mother's boyfriend was interviewed by an officer and had the same version of events as Mother. The officer described their version of events as defensive and evasive, and concluded their story was inconsistent with the evidence.

R.W. has had multiple mental health diagnoses, including attention deficit hyperactivity disorder and depression. Although he has been on medication in the past, Mother did not consistently administer his medication and only gave it to him when he had an outburst. When asked about suicidal ideation, R.W. admitted he put a knife to his wrist once because he did not want to be with Mother any longer. R.W. had previously been hospitalized to treat his disorders, and Mother blamed his mental health for causing the incident. R.W. identified his support system as his grandmother, step-grandmother, and uncle.

Mother called the social worker to cancel a scheduled meeting and stated that R.W. "needs to tell the truth[.] I didn't do anything wrong." After denying R.W. suffered any injuries, Mother stated "[h]e had marks on his neck because we had to hold him down." She recalled that R.W. asked her to call the police, claiming her boyfriend tied him up. In response, Mother told R.W. "you're the one who stole something, you're lucky [my boyfriend] didn't even do anything bad to you." She refused to call the police. According to Mother, R.W. picked up a bat and threatened to destroy the place, and then threatened to cut his wrist.

Mother claimed R.W.'s wrist was red from rubbing it, and that her boyfriend and R.W. were playing a game where her boyfriend would restrain R.W. to see if R.W. could free himself. She finally told the social worker that "CPS taught me . . . to hold him down." When the social worker explained that they do not advise parents to restrain their children, Mother became angry and refused to answer questions. Mother called the social worker over the next few days, continuing to say R.W. was a liar, claiming the marks were the results of his own actions from his disability, downplaying his injuries, and saying she considered pressing charges for obstruction of justice.

4

When the social worker asked if she could put her in touch with her boyfriend, Mother replied "we have the same story."

The maternal step-grandmother supervised a phone call between R.W. and Mother. During the call Mother told R.W. he could not have any of his things unless he changed his story, and that she was worried about her boyfriend going to jail.

The maternal grandmother (Grandmother) spoke to the social worker and stated that she raised R.W. in Nevada for 11 years and that Mother overdosed in front of R.W. twice. She found out about the Agency's involvement through R.W. and said "[R.W.] is not crazy, [R.W.] has anger issues. [Mother] has him so messed up on medications and he doesn't like it. She makes it seem like he has all these problems when he's just angry with her."

R.W.'s father (Father), not a party to this appeal, had a phone call with the social worker and explained that he resides in Las Vegas, and last saw R.W. three months ago when R.W. was staying with Grandmother. He reported he previously completed reunification services in Las Vegas and was not interested in going through the process again. Although he could not have R.W. in his care, as he worked full-time, R.W. could stay with him once he turned 18. Mother only called when R.W. needed to be punished and, after R.W. was discharged from a treatment program, Mother " 'wanted to abandon him so she dropped him off on my porch and tried to run off.' "

B.  *The Petition and Detention Hearing*

At the end of October 2022, the Agency filed a section 300, subdivision (b) petition alleging R.W. was at substantial risk of serious physical harm because Mother's boyfriend tied him up with ropes and tape, causing him to suffer ligature marks on his neck, wrists, and ankles, and

5

cuts, scrapes, and bruises. The petition also alleged Mother was aware of the abuse and failed to protect R.W.

At the detention hearing, Mother, R.W., and step-grandmother appeared in court, while Father appeared by telephone. Mother interrupted the proceedings multiple times to accuse R.W. of lying and to request that R.W. not have any contact with Grandmother. She accused Grandmother of alienating R.W. from Mother and did not want relatives evaluated for placement, alleging they engaged in "parental alienation, trying to separate [R.W.] from [Mother] in the past." She also opposed unsupervised contact between R.W. and Father.

R.W.'s counsel stated that R.W. did not wish to have contact with Mother. Counsel asked for a no-contact order for Mother, as "[t]he contact that they have had since the incident has consisted of [ ] Mother trying to get [R.W.] to change his statements." The juvenile court ordered the Agency take R.W.'s wishes into consideration, explaining "what that means is if you [R.W.] don't want to have a visit, you don't have to have a visit." The court took temporary emergency jurisdiction, removed R.W. from Mother's custody and placed him with the step-grandmother.

C. *The Agency's Jurisdiction and Disposition Report*

The Agency reported in its November 2022 report that Mother continued to blame R.W. for his removal, claimed that he had a disability, and repeatedly called him a liar.

Father told the social worker that R.W. could not live with him, as he lived with his girlfriend, and she did not want R.W. in their home. He called R.W. a terror and told the social worker that he needed military school. He reported R.W. is "hell bent on beating up [Mother]," and "this kid is more violent than I ever been, he tops me." He said R.W. beat up Grandmother

6

hundreds of times. Father concluded by saying if the Agency needed to send R.W. to Nevada, they could. He had no support system, but could feed, clothe, and house R.W. It would take at least a month for him to get things ready for R.W., but Grandmother could take R.W. in.

Grandmother told the social worker that R.W. was an angry child and that her relationship with Mother was strained. She had a better relationship with Father and had no concerns for him and had a good relationship with R.W. Grandmother would take R.W., but she did not have a man to help control him.

R.W. told the social worker he did not trust Mother and did not want to see her or her boyfriend. He also did not want to do therapy, saying the facility did not work for him.

D.    *Initial Jurisdiction and Disposition Hearing*

At the November 2022 hearing, Mother asked for a trial, arguing the petition should be dismissed, or, in the alternative, R.W. be returned to her care. R.W.'s counsel represented that R.W. wanted to live in Nevada with Grandmother and requested Mother return R.W.'s personal items. Mother addressed the court, claimed her rights had been violated, and objected to placement with Grandmother.

E.    *The Agency's January 2023 Report*

In its Addendum Report, the Agency explained that R.W. had four different placements since November 2022. His placement with the step-grandmother ended when she became angry and punched him in the face in the presence of R.W.'s therapist. He was placed in a foster care facility and was so anxious he was throwing up. He asked to go to Grandmother's home in Nevada, but the social worker advised him she could not submit the request for assessment until it was ordered by the court, since Grandmother

7

lived out of state. R.W. continued to struggle at the facility and moved to another facility sometime in early December. He moved to a licensed foster home in mid-December. In January 2023, the foster parent reported that R.W. refused to get out of bed and go to school. He was thus transported back to a foster care facility. Throughout this period, R.W. consistently refused to have contact with Mother. He was assigned a therapist but refused to participate.

Mother continued to call R.W. a liar. She minimized the October incident, saying "he was tied up just for ten minutes, he was fine with it." She said R.W.'s injuries occurred when he fell out of the car and recalled that R.W. had previously hit himself and told law enforcement she hit him.

F. *Father Requests Placement*

At the end of January 2023, Father requested custody of R.W. The social worker believed she could assess him quickly if he responded to phone calls. The court continued the trial upon the agreement of all parties. Father was elevated to presumed status, pursuant to section 7611, subdivision (d) of the Family Code, and requested placement pursuant to section 361.2.

G. *The Agency's February 2023 Report*

In its Addendum Report, the Agency recommended R.W. be placed with Father, and that the court issue custody orders giving him full custody and terminate jurisdiction. Father confirmed he was willing to take R.W., and stated that if R.W. did not do well, he would enroll him in a privately funded program, likely a military camp. He refused to travel to San Diego so that the Agency could observe his interactions with R.W. He also refused to discuss his alcohol use and did not want the Agency involved once he had custody of R.W.

Father and Grandmother planned to raise R.W. together, and if things did not work out, Father would pay for private treatment. Grandmother would care for R.W. while Father was working. Father reiterated the importance of R.W. attending school and having rules, structure, and boundaries and planned to enforce the same in his home. He did not want to see R.W. become a felon and would work with R.W.'s school to ensure his educational needs were met. Father admitted he was not originally interested in placement, but after seeing R.W. run away from placements, engage in substance use, and change placements multiple times, he felt he was the best placement.

R.W. told the social worker he would like to live with Grandmother, but his second choice would be Father. He declined visits with Mother and asked the social worker to stop asking him.

Mother continued to blame R.W. and said her boyfriend did not physically hurt him. She reiterated "Nobody abused him." She called R.W. a liar and said he had a record of lying. She said she cared for her son but did not want him to lie to a cop, a judge, child protective services, or her. The social worker informed her that R.W. recently left his placement without permission and was found so intoxicated he had to go to the hospital. Mother told the social worker that whenever R.W. does anything, including substance abuse, he does it to the extreme. She believed it was limited to alcohol and marijuana.

Grandmother told the social worker that she had been communicating with Father for a while. She agreed it would be better to support, rather than parent, R.W. She would help Father in any way, including watching R.W. after school or during breaks while Father worked. They shared a goal of supporting R.W. through high school and setting him up for success to

9

graduate. Grandmother had no concerns about Father and understood that if the case closed, she would be responsible for reporting R.W. to local authorities if there was a concern about R.W.'s safety. She spoke to R.W. almost daily and was concerned about him running away from placements.

Based on these discussions, the social worker recommended R.W. be placed with Father, and that the juvenile court terminate its jurisdiction. Father wanted the ability to parent R.W. and make parenting decisions that were best for him. Although Father had an "unrealistic expectation," it was "not an issue or safety concern" that required Agency intervention. The social worker assessed that it was "not appropriate" to place R.W. with Mother, since she continued to deny the allegations and blamed R.W. for the family's current circumstances. Because R.W. engaged in high-risk behaviors, she concluded that he should not remain at a facility if there was a safe parent willing and able to meet his needs.

H. *The Agency's March 2023 Report*

In its Addendum Report, the Agency reported that R.W. ran away from placement again in late February. When he was picked up by the social worker, he told her he would not go anywhere but to Father's home. He agreed to call Mother, but her phone was disconnected. He was absent from his school for several weeks.

Father reported R.W. would live with him and would attend school near Grandmother. He would stay at Grandmother's house until Father finished work each day. He would keep R.W. busy with sports, extracurricular activities, and summer school. If R.W. abused substances, Father would have him assessed for treatment. He agreed R.W. needed mental health and medication assessments. If R.W. refused to go to school, Father would pay to send him to a more structured school. He did research

and located a school in Arizona. If R.W. were to "lay hands" on Grandmother, she would call law enforcement and they would utilize a diversion program in Las Vegas.

The Agency sought discretion to detain R.W. in a short term residential therapeutic program, or, in the alterative, to send him to Nevada for an extended visit with Father and Grandmother. R.W. had limited safe placement options as no relatives or family friends were willing to be assessed, he repeatedly ran away from placements and refused to go to school, and he had 24 special incident reports for unsafe behavior since February, including inappropriate physical contact with staff and youth, smoking marijuana, and running away. The Agency was aware of the risks of sending R.W. to Nevada but acknowledged he had not run away since Father and Grandmother asked him to stay in his placement. The Agency assessed that it was in R.W.'s best interest to be with Father with support from Grandmother. They lived seven miles apart.

I.      *March 2023 Court Proceeding*

Mother objected to R.W. moving to live with Father. Counsel for Father and R.W. were concerned that Mother would rather see R.W. in a short term residential therapeutic program than try placement with Father. R.W.'s counsel requested that the court admonish Mother to refrain from discussing the case with R.W., as she continued to pressure him to recant his original disclosures. R.W. addressed the court and said he did not do well in facilities. He lived in Las Vegas his entire life and wanted to return to a familiar setting. The juvenile court granted the Agency's request to fly R.W. to Las Vegas for an extended visit with Father.

11

J.     *Jurisdiction and Disposition Trial*

After several continuances, the trial took place in May 2023. The social worker testified that R.W. was placed in a short term residential therapeutic program earlier that week, but she still recommended he be placed with Father. She was aware of Mother's complaints about Father and investigated them. Most of Mother's allegations appeared to be historical, and there were no current concerns about him.

Mother testified that she was R.W.'s primary caregiver since birth, with help from Grandmother. She reiterated many of her previous statements found in the Agency's reports, including that R.W. inflicted the marks on his neck himself and tried to cut his wrist. Mother's counsel requested the court dismiss the petition or, in the alternative, a voluntary case could be appropriate. He also asked the court to consider drafting its own petition to include a section 300, subdivision (c) allegation, to maintain jurisdiction and order a family reunification case for Mother. Last, he requested the parents share legal custody, urging the court to follow the family court standard of joint legal custody absent a finding of abuse or incarceration.

Father submitted to a jurisdictional finding. His counsel argued that there was no clear and convincing evidence of detriment, and thus, R.W. should be placed with Father pursuant to section 361.2. Father requested the court grant him sole legal custody, so he could address R.W.'s medical and educational needs, since the parents resided in two different states.

R.W.'s counsel stated that R.W. wished to live with Father. His counsel acknowledged Mother's concerns, but also noted that, as the case progressed, Father articulated understanding and expressed a willingness to meet R.W.'s needs.

The Agency asked the court to make a true finding on the petition, remove R.W. from Mother's custody, place him in Father's custody, and terminate jurisdiction. County counsel pointed out Mother was present during part of the altercation and did not protect R.W. then or now.

K.     *The Court's Ruling*

The juvenile court found the allegations in the petition to be true, although in "[v]iewing the facts in a light most favorable to [Mother]," the court did not find that she "committed any neglect or deserves blame here." Nevertheless, the court found clear and convincing evidence that R.W. should be removed from Mother, that Father was a section 361.2 noncustodial parent, and there was no showing it would be detrimental to place R.W. in his care. "The court notes that the Agency has assessed [Father] for placement and has evaluated all of the concerns . . . identified in the reports with regard to [Father.]" The court granted Father custody and terminated jurisdiction.

## DISCUSSION

A.     *General Legal Principles*

If a dependent child would be at substantial risk of physical or emotional harm if left in parental custody, but there is a noncustodial parent who is willing to assume custody, the court must "determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." (§ 361.2, subd. (a).) If such a parent exists (referred to as the "noncustodial parent"), the court is then required to place the child with the noncustodial parent unless it finds that doing so would be "detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subds. (a) & (b)(1) [the court has

13

the option to order the noncustodial parent to become legal and physical custodian of the child and terminate jurisdiction]; *In re Maya L.* (2014) 232 Cal.App.4th 81, 97-98.)

When making a custody determination, " 'the court's focus and primary consideration must always be the best interests of the child.' " (*In re T.S.* (2020) 52 Cal.App.5th 503, 513.) This determination is made without reference to any preferences or presumptions ordinarily applicable in family court. (*In re Jennifer R.* (1993) 14 Cal.App.4th 704, 712 (*Jennifer R*).) "[A] finding that neither parent poses any danger to the child does not mean that both are equally entitled to half custody, since joint physical custody may not be in the child's best interests for a variety of reasons." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.)

We review orders terminating dependency proceedings and making a custody award for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) " ' "The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.) "A court abuses its discretion in making a child custody order if there is no reasonable basis on which it could conclude that its decision advanced the best interests of the child" or "it applies improper criteria or makes incorrect legal assumptions." (*In re Marriage of Fajota* (2014) 230 Cal.App.4th 1487, 1497, italics omitted.)

A judgment or an order is presumed to be correct and the party challenging the order must affirmatively show error. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140-1141.) We presume that the juvenile court regularly performed its duty by understanding and applying the law

14

correctly.  (*In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 653; Evid. Code, § 664.)

> B.    *Analysis*

>> 1.    *Termination of Jurisdiction*

Mother argues that the juvenile court abused its discretion in terminating jurisdiction.  She maintains that "unresolved safety issues required court supervision" and "[n]o evidence showed it was in [R.W.'s] best interest to terminate jurisdiction."  As Mother correctly points out, R.W. had not lived with Father for a significant period and Father initially refused to allow it.  R.W. had also shown troubling behavior while in protective custody.  Additionally, Mother was concerned Grandmother may not be able to supervise R.W. while Father works.  The juvenile court correctly found that the Agency addressed these concerns.

As the Agency noted, "[t]o say this is a difficult case is an understatement."  Although all parties reported historical concerns, the Agency worked with Father and Grandmother to determine how to handle potential difficulties and assessed Father to be "a safe non-offending parent" and "willing to care for [R.W.]."  The Agency did "not have current safety concerns for [Father]" and determined that he "is able and willing to be protective and meet the needs of [R.W.]."  The court found that the Agency "assessed [Father] for placement" and "evaluated all of the concerns identified in the reports with regard to [Father]."

Father worked full-time and planned to coordinate with Grandmother so that R.W. would have supervision after school until Father returned home from work.  Father planned to keep R.W. busy with school, sports, extracurricular activities, and summer school.  He was aware R.W. frequently refused to attend school and he planned to pay for a more structured school

15

program if needed and had already located one in Arizona.  He was aware of R.W.'s substance abuse and agreed to have him assessed for treatment if necessary.  He communicated frequently with Grandmother, they lived 15 minutes apart, and R.W. would attend school not far from her home.

Similarly, Grandmother was prepared for R.W.  She planned to have R.W. assessed for medication and begin treatment if he abused any substances.  She was going to keep him involved in sports, and use sports as an incentive to encourage him to attend school.  If R.W. missed school, she would ask the truancy officer to intervene.  She would stay safe by pressing charges if R.W. became physical with her and utilize a crisis line.

Significantly, R.W. wanted to live with Father and Grandmother and appeared to show some respect for their authority.  When they encouraged him to stay in his placement, he did not run away.  When Father told R.W. he needed to complete the psychological evaluation and go to school, he did both. Additionally, R.W. grew up in Las Vegas, viewed that city as his home, and felt everything was "fine" for him there while it was "just . . . a bumpy ride" for him in San Diego.

Mother asserts that the court should have maintained jurisdiction over R.W. until the Agency could confirm he would not "wind up in juvenile hall again."  But the fact that a child may find himself in juvenile hall is not a basis for dependency jurisdiction.  (§ 300; see also § 241.1, subd. (d) [prohibiting a child from being treated simultaneously under the court's dependency and delinquency jurisdictions].)  Moreover, the fact that R.W. spent time in juvenile hall during the pendency of this dependency case shows that maintaining jurisdiction may not have the result Mother seeks. Further, contrary to Mother's complaints, it was reasonable for Father to express his desire that the San Diego-based Agency withdraw from

involvement when R.W., his school, and any service or program he needed would be in Nevada.

Similarly, although Mother argues that ongoing jurisdiction was necessary to ensure Father had "the resources he needed to parent an extremely difficult teenager," she does not suggest any type of resource the court could provide that Father and Grandmother had not already identified. Thus, Mother failed to meet her burden to show the juvenile court abused its discretion in terminating jurisdiction.

### 2. *Reunification Services*

Despite Mother's argument to the contrary, she was not entitled to reunification services. (§ 361.2, subd. (b).) Her reliance on *In re Erika W.* (1994) 28 Cal.App.4th 470, is also misplaced. As the Court of Appeal explained there, Section 361.2, subdivision (a)(2) "invests the juvenile court with discretion as to the provision of reunification services to the parents." (*In re Erika W., supra,* 28 Cal.App.4th 470 at p. 475.) Thus, where the court determined that the father, as the noncustodial parent, "can provide a safe and stable permanent home for the child" and the evidence established that the mother could not, "reunification services may be offered only to the previously noncustodial parent." (*Id.* at p. 476, italics omitted.) As in *In re Erica W,* "when a child is placed in parental custody, . . . reunification services are not necessary." (*Id.* at p. 478.) There, like here, the juvenile court did not err in denying reunification services to the mother.

Moreover, even if the court had maintained jurisdiction, it would have been within the court's discretion to deny Mother reunification services. Throughout R.W.'s dependency case, Mother did not participate in any voluntary services. She consistently called R.W. a liar to the Agency and to the court and repeatedly tried to get R.W. to recant his allegations. She

17

frequently alleged that Grandmother and other relatives were trying to alienate R.W. from her. Additionally, R.W. refused to visit her. After R.W. spoke to her on the phone, R.W.'s counsel asked Mother to stop pressuring him to recant his allegations.

In short, the court did not act arbitrarily or capriciously in denying Mother reunification services. (*In re C.W.* (2019) 33 Cal.App.5th 835, 863 [when reviewing for abuse of discretion, we may not disturb such rulings unless the court made an " ' " ' "arbitrary, capricious, or patently absurd determination" ' " ' "].)

### 3. *Sole Legal Custody*

Mother argues that the juvenile court abused its discretion in granting Father sole legal custody. She claims that "no facts showed she was unwilling to work with [F]ather to make important life decisions for her son." She also asserts that "[c]ordial communication between parents that were no longer together was not necessary or required in order for [M]other to maintain joint legal custody with [F]ather." Despite her arguments, the "presumption of parental fitness that underlies custody law in the family court just does not apply to dependency cases." (*In re Jennifer R.*, *supra*, 14 Cal.App.4th 704 at p. 712.) "[T]he juvenile court, which has been intimately involved in the protection of the child, is best situated to make custody determinations based on the best interests of the child without any preferences or presumptions." (*Ibid.*) Indeed, "it is the best interests of the child, in the context of the peculiar facts of the case before the court, which are paramount." (*In re John W.* (1996) 41 Cal.App.4th 961, 965.)

Here, Mother lived in California while Father lived in Nevada. The Agency had to hold two separate child and family team meetings in March 2023, because R.W. refused to participate with Mother and there were prior

18

domestic violence incidents between the parents. Despite Mother's claim that she was R.W.'s primary caregiver his entire life, R.W. lived much of his life with Grandmother, and then spent more than a year at a treatment program, alternating living with Grandmother and Mother before the Agency removed him from Mother's care. R.W. did not want to have anything to do with Mother and wanted to move back to Las Vegas with Father. It was not unreasonable for the court to grant Father sole custody so that he could make educational and developmental decisions for R.W.

In reviewing the sufficiency of the evidence, all conflicts must be resolved in favor of the respondent and all legitimate inferences indulged to uphold the judgment, if possible. (*In re Kristin H*. (1996) 46 Cal.App.4th 1635, 1649.) In assessing what is in the child's best interests when making a custody determination pursuant to section 362.4, a court must consider the totality of the child's circumstances. (*In re Roger S*. (1992) 4 Cal.App.4th 25, 30-31.) Here, considering the totality of the circumstances, the record contains substantial evidence supporting the court's findings and orders.

DISPOSITION

The juvenile court's findings and orders are affirmed.


CASTILLO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


KELETY, J.

19