Filed 12/1/25  In re S.K. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| In re S.K. et al., Persons Coming Under Juvenile Court Law. | B344180 <br><br> (Los Angeles County Super. Ct. No. 24CCJP03594) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LIZETTE K., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Debra L. Losnick, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

_____

Appellant-mother Lizette K. appeals from juvenile court orders: (1) sustaining a petition filed by the Los Angeles Department of Children and Family Services (DCFS) under Welfare and Institutions Code section 300 on behalf of Mother's two children, S.K. (born July 2010) and K.K. (born February 2015); and (2) removing the children from Father and releasing them to Mother.[1]  Mother argues: (1) substantial evidence does not support the court's jurisdictional findings; and (2) the court violated her constitutional rights by not permitting her attorney to be heard on the issue of disposition.  We conclude: (1) substantial evidence supports the court's assumption of jurisdiction under two counts of DCFS's petition—and thus need not reach the merits on the third count; and (2) the court did not prevent Mother's attorney from arguing on the issue of disposition.  We therefore affirm.

_____

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *DCFS Investigates a Referral*

#### 1. Initial Investigation

In August 2024, the Child Protection Hotline received a report that S.K.'s school had received an anonymous tip stating that S.K. had told the reporting party that S.K.'s father, V.K., raped her. However, the reporting party stated S.K. also said she experienced sexual abuse but not from Father—S.K. claimed she was sexually assaulted by a 16-year-old boy with whom she was walking in the park. The reporting party also stated Mother was in and out of hospitals because she suffered from multiple sclerosis, and Father used drugs often. When Father drove S.K. to school the day the report was made, he was "swirling." The reporting party stated there were drugs and drug paraphernalia in the garage that the children had access to, and once K.K. walked into the garage to see Father engaging in sexual activity with "[s]omeone who did not have any clothes." The reporting party added Mother attempted to file a divorce from Father a few times.

A children's social worker (CSW) interviewed the family at the paternal grandparents' home, where they were living. When the CSW arrived, a sheriff's deputy was already present.

The CSW first interviewed K.K. She "explained her role [to K.K.] along with the purpose of the interview." She assured K.K. she was not in trouble, but she needed K.K. to tell her the truth, so she could assess K.K.'s safety; K.K. agreed.

After some preliminary questions, the CSW discussed the allegations from the referral with K.K. and asked for her perspective. K.K. stated that she had gone into the garage to get

a popsicle and had seen Father and a "girl . . . laying on the floor." She denied seeing anything more than "them being asleep." She told her sister and the paternal grandfather (PGF). K.K. denied seeing anyone in the house use drugs, drink alcohol, or "act strange."

K.K. also reported she had been having nightmares for two years, resulting in an inability to sleep. "She stated she tried to cut her wrist with a knife before" and that "sometimes her hand is out of control and she tried to grab her neck and had to use her other hand to peel off neck [*sic*]." K.K. "stated the voices get louder" and she "has heard Legends at school during recess for the last 3 weeks."[2] The "voices had told her to kill her friend, but her friend moved. She stated when she hears voices she will read a sentence of the bible but sometimes it doesn't help." K.K. also told the sheriff's deputy who interviewed her earlier that "she heard voices in her head that would tell her to hurt herself or other people," that "the voices told her to strangle herself, and use one of her hands to hold her neck tight until she couldn't breathe" and that, once when she was "at school . . . holding scissors[,] the voices told her to cut her best friend's skin off." Because K.K. reported hearing voices, the sheriff's deputy called a Department of Mental Health mobile team to assess her; they subsequently transported her to a hospital.

Mother told the CSW that she first learned of the sexual assault on S.K. at a meeting with the school. Mother denied Father would ever harm the children but when asked about "any concerns of substance abuse or drinking alcohol," "Mother didn't say anything[,] but her look appeared like she was aware of

_____

[2] The record does not explain who or what "Legends" is.

4

father's issues. She stated that [a] counselor advised her to find someone else to transport the children to and from school." Mother was unaware K.K. was hearing voices.

S.K. confirmed to the CSW K.K.'s statements about the woman in the garage, clarifying the woman was sleeping on the floor and Father was sleeping on a couch. S.K. stated another minor—and not Father—had "touched her private parts inappropriately" but she had already told a school counselor about it, as well as an aunt, and she did not want to go into detail about it with the CSW. S.K. stated she did not tell Mother things because "she doesn't want her to worry" and mentioned Mother had just come home from the hospital. S.K. also denied seeing anyone use drugs, drink alcohol, or act strange in the house. S.K. reported K.K. never said she was sad or wanted to hurt herself.

The CSW also spoke with a school counselor who reported she had discussed with Mother the substance abuse allegations regarding Father and Mother "seemed aware." The counselor confirmed she suggested Mother find another way for the children to get to and from school. The counselor also stated S.K. had a "history of suicidal ideations and self-inflicting cutting, burning etc." S.K., however, had denied to the counselor that she had any desire to hurt herself.

The CSW spoke with Father six days later. He denied using drugs and stated he only drank socially, and not that much because he had two "DUIs" in 2002.[3] Father confirmed there had

---

[3] DCFS later unearthed Father was arrested and convicted for a DUI in 2002, arrested and convicted of a DUI in 2005 and arrested for possession of marijuana and another DUI in 2005, arrested and convicted for a DUI in 2008, and arrested for possession of a controlled substance in 2011.

been a woman in the garage with him, but stated she was a friend's girlfriend, was fully clothed, and was sleeping on the couch.  Father stated he sometimes had friends over in the garage, but the children were not present during those gatherings.  Father agreed to drug test.  He later tested negative for all substances.

Father stated that, due to a chronic illness, Mother "would have episodes and lose feelings in her legs and sometimes fall." The paternal grandparents helped him take care of the children when Mother was in the hospital.

Father reported K.K. was still in the hospital but had told him when the family visited that she was ready to come home and was scared of the other children at the hospital.  Father stated K.K. "told him what she said," presumably about wanting to hurt herself and others; he opined she was a "good kid with a big imagination."  As for S.K., Father stated the school was trying to refer her for therapy and that he was open to the idea if S.K. wanted to speak with a therapist.

The CSW also spoke with Angie Muneton, who appeared to work at the hospital where K.K. was under observation.[4] Muneton stated K.K. had told her "she wanted to use scissors to cut herself" but also said she was just "saying that" because when the sheriff's deputy was at her home, she did not know what to say.  K.K. told an occupational therapist at the hospital that "she has heard voices that told her to hurt herself and when she is happy her body hurts."  K.K. was discharged at the end of August with a recommendation to continue outpatient therapy services. K.K. "was not on any medications; family never gave consent."

---

[4] The record did not specify Muneton's position.

## 2. Father Is Arrested

Father was arrested in the beginning of September 2024 for possession of a controlled substance with intent to sell, transportation of a controlled substance, and possession of drug paraphernalia. PGF bailed him out, and he returned home. When the CSW asked Mother how she felt about the arrest, she said, "disappointed, bothered and Why? Why again[?]" Mother also stated she felt K.K. was "normal" and did not need counseling; she expressed she did not want "services" for K.K. PGF said he was disappointed that Father "continues to make bad decisions."

Also in September 2024, a school counselor informed the CSW that Father had declined therapy for S.K., stating she did not want it. In contrast, the counselor reported that, when she spoke to S.K., S.K. said she was willing to try therapy.

In October 2024, DCFS received the police report from Father's arrest. It indicated an officer approached Father's car, smelled marijuana, and noticed Father making "furtive movements to the right side of his shorts." Both Father and a female passenger were "sweating profusely and acting nervously." A search of the car revealed a pipe used for smoking methamphetamine. On Father's person, police found "14 small empty baggies in his right shorts' cargo pocket," "another glass pipe with a bulbous end and stem, coated with a white and burnt residue," "two separate plastic baggies in [Father]'s left shorts' cargo pocket" that "contained an off-white crystal-like substance that [the officer] immediately recognized as methamphetamine." "[O]ne of the baggies containing methamphetamine was identical to the empty baggies" Father had. Father "confirmed that the methamphetamine located on his person was his property. He

7

believed the total amount of methamphetamine to be in his possession was approximately two grams. He mentioned that he purchased a quarter ounce of methamphetamine 'a few days ago' for approximately $50.00. [Father] stated that the 14 plastic baggies located on his person were going to be used for storage of tools. [Father] said he smokes methamphetamine approximately two to three times a week and will typically use one gram per usage." Father "stated he has been using methamphetamine for approximately 20 years and last used yesterday."[5]

The CSW again spoke with Mother who claimed she was unaware of Father's "activities." PGF opined Father "made a mistake" but did not have a problem. The CSW explained to PGF that if the children were removed from Father, Father "cannot be in the home or the children will have to be removed from the home." PGF stated Father financially supported the family and that PGF "disagrees with decision and that he will fight with an attorney." PGF reported Father had said the substances found on him when he was arrested "belonged to his friend." PGF stated he knew about Father's "past issues and has not suspected any issues recently." A "family relative" informed the CSW "she has heard the children say that father is getting high," "although she has never heard nor questioned the type of substance he uses."

### 3.    Continued Investigation

In November 2024, a CSW spoke with S.K. again. S.K. was supposed to have a counseling appointment the previous week

---

[5] The female passenger with Father told the police she had known Father for a year and was aware he used methamphetamine.

but Mother "never followed through with the appointment," and Father thought therapy was unnecessary. S.K. denied seeing any drugs or drug paraphernalia at home.

The CSW also spoke with Mother, who stated K.K. had denied having auditory hallucinations or thoughts of self-harm; she opined K.K. was "scared and did not know what to say when" initially questioned. Mother admitted she rescheduled S.K.'s counseling appointment twice before canceling it.

The CSW spoke with K.K. who confirmed Father was still picking her up from school. She denied having any auditory hallucinations or thoughts of self-harm and stated she had not seen a therapist since discharge. Echoing Mother, K.K. stated "when the police and the social worker initially came, she felt scared and did not know what to say. The child stated that at that time, she had made everything up and denied having thoughts in her head of harming herself or others."

Examining the garage, the CSW discovered drug paraphernalia: a single, open aerosol can with the top removed, a lighter, a glass cup with small amounts of brown clear liquid, an open knife, and a marijuana vape pen. Both Mother and PGF stated they were unaware of the paraphernalia. PGF admitted he knew Father smoked marijuana.

### 4. DCFS Files a Petition

In November 2024, the court denied DCFS's request for a removal order, finding there was an inadequate showing that there were no reasonable means to protect the children without removing them. The CSW informed the parents of the denial but stated there would be a court hearing. Both parents denied Father had a substance abuse issue, but Father refused to drug test.

The next day, DCFS filed a petition on behalf of S.K. and K.K. under section 300, subdivisions (b)(1), (c), and (j).  Counts b-1 and j-1 identically alleged K.K. "suffers from mental and emotional problems, including auditory hallucinations, suicidal ideation, self-harming behavior and a recent psychiatric hospitalization," and the parents neglected her by failing to ensure she regularly participated in mental health services, placing both S.K. and K.K. at risk.  Count b-2 alleged Father had a history of substance abuse and was a current abuser of methamphetamine, sometimes while the children were in his care.  The count also alleged that drug paraphernalia was in the home in an area the children could access, and that Mother knew or should have known about Father's drug use and failed to protect the children from it.  Count c-1 contained the same factual allegations about K.K. as count b-1 but accused the parents of "emotional abuse[]" instead of "neglect[]" in failing to ensure K.K. regularly participated in mental health services and added K.K. was at "substantial risk of suffering serious emotional damage as evidenced by severe anxiety, depression, withdrawal and aggressive behavior toward herself and others."

On the day of the December 2024 detention hearing, Mother demurred to count c-1, arguing it failed to state a cause of action because "[t]he parents' conduct is not asserted to have caused the child's alleged mental health condition and therefore the parents cannot be charged with emotional abuse."  At the detention hearing, the court found a prima facie case that the children were persons described by section 300 but concluded there were reasonable services to prevent their detention from the parents.  The court ordered that the parents were required to continue living with the paternal grandparents, that Father

10

could not be under the influence in the home, that Father could not drive the children if he was under the influence, that Father could not leave the home with the children unless accompanied by Mother or one of the grandparents, and that Father was to submit to consistent drug tests and test negatively.

## B.  *DCFS Continues to Investigate*

In December 2024, a dependency investigator (DI) spoke with S.K., who stated she had never seen K.K. self-harm, have hallucinations, threaten others, or behave strangely.  As for Father, S.K. stated: "My dad, h[e ]is into something, but he is his own person and I don't intervene.  I haven't seen him do drugs.  He is not home and we[] barely know where he is.  Maybe h[e ]is at his job.  I don't know, but he is not always here.  I don't think there's no drugs in the home [*sic*].  Do I suspect drugs in the home?  I don't know.  Is my dad using drugs?  I don't know.  I am in my own bubble, reading books.  That's all I know."  When asked about her worries, S.K. stated she was worried "she will be removed and will be placed away from her family."

K.K. told the DI she was nervous when the first social worker spoke with her, and "I said random things because I didn't know what to say.  I was seeing a lot of horror movies and I just said something about the movie.  At the hospital, I was nervous too.  I don't want to go back there.  I told them that I was nervous only, but they didn't want to believe me."  K.K. added, "I never said I was going to hurt anyone with a knife.  That was from the movie!"  But K.K. could not remember the name of the movie the line was from.  K.K. denied hearing voices, having nightmares, or having thoughts of hurting herself or others.  As to Father, K.K. stated she did not know much about what he did, but that he was always tired, relating an incident in which he

11

"crashed into someone else in front of my school because he didn't sleep a lot." She stated there were no drugs or alcohol in the home and "adamantly denied" that either of her parents used drugs. K.K. stated she was doing well, did not want to return to the hospital where she was admitted for a psychiatric hold, and wanted to remain home with her family.

The DI noted Mother "had low physical mobility" and slurred her words due to her medical condition. The DI "was advised that the mother has short attention span and memory loss" and the DI noted Mother was "coherent" but "information had to be presented in simple terms." When asked why K.K. did not see a therapist after being discharged, Mother explained it was because they did not have a car as Father had "crashed" theirs. She confirmed Father did not want the children to receive mental health services. When asked if she now understood the importance of the children receiving mental health services, Mother nodded her head.

Mother acknowledged Father used marijuana "all the time" in the garage, but denied the children went to the garage or had access to the marijuana. When asked about other drugs used by Father, Mother "shook her head and shrugged her shoulders." When asked specifically about methamphetamine, Mother's eyes "widen[ed]," she had a "confused look," and she said: "I don't know . . . He uses that? I don't know!" Mother also seemed unaware of Father's DUI arrests.

The DI spoke with the maternal grandmother (MGM), who characterized K.K. as a "happy and caring child" and dismissed her previous statements by opining "children will say anything." MGM confirmed K.K. "watches a lot of scary movies, something that she does not approve of, but [it] appears that the parents do

12

not supervise what the children watch." MGM also acknowledged Father "has a history of consuming marijuana and drinking." Although she had never seen Father use marijuana, "on several occasions she has seen the father completely high on marijuana, passed out on" a couch. MGM stated it was "embarrassing to see the father in that condition, and feels sorry [for] the minor children to see their father in that state. The grandmother stated that when she visits, she tries to remind the minor children from not looking [*sic*] at their father under those circumstances."

The DI spoke with a school counselor, who was not a therapist or mental health provider, about K.K. The counselor stated she met with K.K. on a weekly basis, and she seemed to be doing well. She stated that, prior to K.K.'s hospitalization, there were no concerns at school regarding her mental health.

The DI made several attempts to speak with Father but, as of the date the DI submitted the Jurisdiction / Disposition report—January 10, 2025—Father had not made himself available. Father was scheduled for four drug tests in December 2024 and one in January 2025 and missed every one.

## C. *The Court Detains the Children From Father*

In mid-January 2025, DCFS asked the court to strike count c-1, indicating it would file an amended petition. The court stated it would continue the demurrer hearing to the adjudication and disposition hearings set for January 27, 2025, and find the demurrer moot after DCFS filed the amended petition. DCFS filed the amended petition that same day.

DCFS held a Children and Family Teams meeting with the parents four days before the initial adjudication hearing. During the meeting, a DI "questioned the father as to the last day/time

13

that he consumed any substances, including methamphetamines. The father responded that his last time using methamphetamines was about 6 months ago; denying that the has a substance abuse problem with methamphetamines." He agreed to drug test the next day, January 24.

At the initial adjudication hearing, Father's counsel requested a continuance, which the court granted. At the same hearing, DCFS's counsel asked the court to detain the children from Father because Father had not been drug testing as agreed. Counsel for all other parties opposed the request, opining the issue could be addressed at the continued hearing in two weeks. The court denied DCFS's request but admonished Father he was on "thin ice" and needed to "shape up and start testing and start doing the things that have been asked of you."

On January 28, the day after the initial adjudication hearing, DCFS learned Father had tested positive for methamphetamines on January 24. The DI spoke with Father the next day. Father told the DI "he first used marijuana at the age of 23 and became a regular user of marijuana until about 3 months ago."[6] He admitted he first used methamphetamines at age 25 and was a "heavy user" between ages 26 and 28. He then stopped from ages 29 to 37, beginning again when he was 37 (i.e., in 2017). He reported smoking methamphetamines "on a regular monthly basis." He initially stated he last smoked when he was arrested in September 2024. When confronted with the results of his latest drug test, Father at first said, "What? That's impossible." Father then admitted, "Okay. Yes. It was the day before our [CFT] meeting. I did a couple of hits that night. I was

---

[6] Father was born in July 1980.

stressed out from all of this."[7]  Father agreed to continue drug testing and assured the DI the next test would be negative for all substances.  But he continued denying he had an alcohol or methamphetamine problem.  He claimed "he can control himself from using meth, . . . does not crave it, does not need it," but admitted "if he sees meth available, he likely will find himself consuming that available meth."  Two days after speaking with Father, DCFS filed a section 385 petition, asking the court to detain the children from Father.  The court granted the request, ordering monitored visits for Father with a DCFS-approved monitor who was not Mother.

_____

[7] DCFS noted in its report that "it is known that methamphetamine continues to be detected in urine samples up to 72 hours after the person's last usage of the drug.  If in fact, per the father's statements that he last used methamphetamines the night of 01/22/2025, which is only a day before the in-person CFT meeting, it creates serious concerns for the father's true addiction.  The father's high levels found on the test date of 01/24/2025 leads the Department to assess that the father likely also used the day before (01/23/2025) after the 4-hour (evening) CFT meeting.  The same CFT meeting where the Department explicitly presented their concerns to the father, that included the father's substance abuse issues (at which time the father denied to have).  It should be noted that during the CFT meeting of 01/23/2025, the father did not present nor appear to be under the influence.  He did not present with the normal symptoms of a person being under the influence nor appear to be withdrawing from the drug.  The father was coherent, engaged in the meeting, sharing and appearing to intake the information."

15

### D. *Father Visits the Home Despite Court Orders to the Contrary*

DCFS confirmed with the family that Father moved out of the home on January 31, 2025. From January 31 to February 6, 2025, Father refused to speak with DCFS. On February 6, he sent a long text message to a CSW, stating in part the CSW was wrong when he stated Father used methamphetamines to "cope" the last time he used—he "really decided to use out of spite." Father accused DCFS of violating his right to privacy and insisted his "drug use not abuse was something I did in private." He missed his next two drug tests.

On February 4, 2025, DCFS met with Mother and PGF "to discuss the detention orders and visitation expectations" and both expressed they "were in full understanding of these orders and conditions." Yet, three days later, Father arrived at the family home and asked to use the shower; PGF let him in. Mother reportedly asked Father to leave and threatened to call the police. However, when DCFS followed up with Mother on the same day the incident occurred, she "claimed she had no recollection of the father arriving this morning to the home." Mother later called a CSW to apologize for "not being forthcoming" and admitted Father came to the home asking to shower, and PGF let him in. Father showered, greeted the children, then left. PGF also admitted the situation, stating he did not "have the heart" to turn his son away. DCFS was informed by Mother's sister that Father "has been coaching and intimidating the mother and the minor children to not speak up to the Department social workers, avoiding answering any questions or to only answer with 'I don't know's.' "

16

## E.    *The Court Removes the Children From Father*

### 1.    Adjudication

At the February 2025 adjudication hearing, the court noted the amended petition and dismissed count c-1.  The children's counsel asked the court to sustain counts b-1 and j-1 (alleging the parents neglected K.K. by failing to ensure she participated in mental health services), but strike allegations that Mother failed to protect the children, because Mother subsequently indicated she understood the importance of mental health services and expressed willingness to follow court orders.  She also asked the court to sustain count b-2 (alleging Father's substance abuse and Mother's failure to protect the children from that substance abuse endangered the children).

Mother's counsel asked the court to dismiss from count b-2 allegations that Mother failed to protect the children because the children suffered no harm, and Mother could not be liable for "failure to protect against a nonexistent harm."  Counsel also opined it was more likely K.K. was "a nine-year-old with a very vivid imagination" who was just nervous when first interviewed and asked the court to dismiss counts b-1 and j-1 in their entirety.  Counsel added that even if the court believed K.K. needed mental health treatment, Mother's failure to procure that treatment was neither willful nor negligent.

Father's counsel also asked the court to dismiss count b-1, alleging there was scant evidence K.K. needed mental health services.  Counsel additionally argued there was no causal connection between Father's drug use and harm to the children, pointing out neither child had stated she saw Father using drugs, and Father kept all drugs away from the children.  Counsel also

17

pointed out there was no evidence Father's alcohol consumption put the children in any danger.

DCFS's counsel joined the arguments of the children's counsel but argued the allegations against Mother should not be stricken. Acknowledging Mother had medical issues, DCFS's counsel nevertheless argued that, "at some point, she just needed to simply pick up the phone and make a phone call to do some follow-up. She did not do that." As to Father's drug use, DCFS's counsel argued there was drug paraphernalia present in the garage, and the children had access to the garage.

The court noted K.K. suffered harm just from being hospitalized and pointed out that the medical professionals who examined her saw "something going on." The court expressly stated it did not believe "that children make up these kinds of stories because they're nervous with the police. Generally, children are nervous and they tell the truth, which I believe is what happened in this case." The court sustained counts b-1 and j-1, and sustained count b-2 after amending it to strike allegations regarding alcohol and modifying it to allege Mother was "unable" to protect the children.

## 2. Disposition

Before the court addressed disposition, DCFS's counsel asked the court to impress upon Father "how close the department was to asking this court today to detain the children," and that the only reason DCFS had not done so was because social workers on the case "firmly believe that putting these children in foster care or away from their parents would just make things worse," and not because they condoned the family violating court orders or were unconcerned about Father's substance abuse. After DCFS's counsel spoke, the court stated it

18

did not "feel it necessary, frankly, to hear from other counsel because the report that I read today indicates that the parents did in fact say that the father was let into the house to take a shower. The grandparents said that they were there, they knew he was doing so, and that they were all apologetic for not being forthcoming with the social worker. The bottom line, however, is going forward, there just cannot be any violations of the court orders or the kids can't stay there. And I can't make it any more clear. If the court makes an order, it needs to be followed, or other steps are taken. So I'm going to leave it there."

The court then stated that, "[f]or purposes of the disposition," it had a case plan for each parent and asked counsel if they had any comments on the case plan. Mother's counsel opined the case plan was "narrowly tailored" and made no argument. Father's counsel asked only that Father not be required to undergo conjoint counseling with Mother; the court denied that request. Nothing in the record indicates either parent's counsel believed they were prohibited from making arguments about disposition or had any other arguments to make.

The court removed the children from Father and placed them with Mother under DCFS supervision. Father was granted monitored visits.

Mother timely appealed.

## DISCUSSION

### A. *We Determine Whether the Court Erred in Finding Mother to be an Offending Parent*

DCFS argues that, by not raising the argument below, Mother forfeited her challenge that "no substantial evidence

19

supported count b-2, and the count should be dismissed in its entirety." Because Mother "cannot effectively challenge count b-2, to the extent it is based upon father's conduct, . . . dismissal of counts b-1 and j-1 would provide mother with no effective or practical relief as the juvenile court's jurisdiction and the disposition orders would remain." Therefore, DCFS contends we should dismiss Mother's entire appeal as moot.

While we agree that we would have no need to consider the merits of Mother's challenge to counts b-1 and j-1 if the court did not err in—or Mother could not challenge—the court's findings under count b-2, we disagree that Mother forfeited her substantial evidence challenge to count b-2. (See, e.g., *In re J.N.* (2021) 62 Cal.App.5th 767, 777, fn. 5 ["a claim that the evidence is insufficient to support a disposition order in a dependency matter generally is not forfeited even if not raised below"]; *In re Brian P.* (2002) 99 Cal.App.4th 616, 623 [" 'Generally, points not urged in the trial court cannot be raised on appeal. [Citation.] The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule' "].)

Moreover, even if Mother's appeal were moot, appellate courts have "inherent discretion to decide certain challenges to juvenile court jurisdictional findings, notwithstanding mootness." (*In re D.P.* (2023) 14 Cal.5th 266, 285.) In exercising that discretion, courts properly consider "whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or ' "could have other consequences for [the appellant], beyond jurisdiction." ' " (*Ibid.*) "A prior jurisdictional finding can be considered by the Department in determining whether to file a dependency petition or by a juvenile court in

20

subsequent dependency proceedings. . . . In such circumstances, ensuring the validity of findings on appeal may be particularly important." (*Ibid.*)

Here, where Father's unacknowledged and untreated drug abuse may result in his losing custody of the children, a finding that Mother is an offending parent would almost certainly prejudice her ability to keep custody of her children, and an erroneous finding in that regard would very likely adversely impact current or future dependency proceedings. Further, should the parents divorce—the initial report of abuse mentioned Mother had tried to divorce Father "a few times"—whether Mother is an offending parent may also factor into custody decisions. As such, even if Mother's challenge to counts b-1 and j-1 were moot, we would exercise our discretion to decide on the merits whether the court erred in finding her an offending parent.

**B.** ***The Court Did Not Err in Finding Jurisdiction, or That Mother Was an Offending Parent, Under Counts B-1 and J-1***

### 1. Applicable Law

A child may be adjudged a dependent of the court if she "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of any of the following: [¶] (A) The failure or inability of the child's parent or guardian to adequately supervise or protect the child. [¶] . . . [¶] (D) The inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse." (§ 300, subd. (b)(1).) "[F]or dependency jurisdiction to exist due to substance

21

abuse pursuant to section 300(b)(1)(D), this abuse must render a parent or guardian unable to provide regular care for a child and either cause the child to suffer serious physical harm or illness or place the child at substantial risk of suffering such harm or illness." (*In re N.R.* (2023) 15 Cal.5th 520, 531.)

A child may also be adjudged a dependent of the court if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." (§ 300, subd. (j).)

We review jurisdictional findings for substantial evidence. (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1161–1162.) "In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court. Evidence from a single witness, even a party, can be sufficient to support the trial court's findings." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450–451.)

## 2.    Counts B-1 and J-1

Counts b-1 and j-1 alleged the parents placed the children at substantial risk of harm because the parents failed to ensure K.K. participated in regular mental health services. The court credited K.K.'s initial statements about wanting to hurt herself

and others, pointing out the medical professionals who examined her saw "something going on."

Substantial evidence supports the court's conclusion. K.K. told the CSW she had previously tried to cut her wrists with a knife and would sometimes try to choke herself. She told a sheriff's deputy that voices in her head told her to hurt and strangle herself. At the hospital where she was under observation, K.K. told someone she wanted to use scissors to cut herself and stated she "heard voices that told her to hurt herself." K.K. was not medicated—her family had not consented—but the hospital discharged her with a recommendation that she seek therapeutic help. These statements constitute substantial evidence supporting the court's conclusion that, if K.K. continued to lack professional care to address her thoughts of self-harm, she would be at substantial risk of suffering serious physical harm, either from complying with these thoughts, and/or being re-hospitalized because of them.

Similarly, a school counselor reported S.K. had a "history of suicidal ideations and self-inflicting cutting, burning etc." Given that S.K. was also dealing with the aftermath of being sexually assaulted, substantial evidence supports the conclusion S.K. was at substantial risk of being neglected as provided in section 300, subdivision (b).

Mother argues the court erred in finding jurisdiction under these counts because K.K. "did not exhibit any outward emotional distress symptoms," "was well-behaved both at school and home," and "attended weekly counseling with a school counselor, who had no concerns for the child." Mother points to evidence that DCFS agreed to dismiss count c-1, that K.K. self-reported she either made up or no longer had thoughts of self-harm, that

23

family members were surprised to hear K.K. had these thoughts, and that personnel at K.K.'s school—none of whom were licensed therapists—believed she was doing better.  But Mother does not deny the existence of the evidence supporting the court's conclusion.  Thus, what she asks of us is to reweigh the evidence and arrive at a contrary conclusion.  This we cannot do.

"When a finding of fact is attacked on grounds that it is not supported by substantial evidence, the power of an appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the findings."  (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 598.)  " ' " '[W]hen two or more inferences can reasonably be deduced from the facts,' either deduction will be supported by substantial evidence, and a 'reviewing court is without power to substitute its deductions for those of the trial court.' " ' "  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)  In short, the fact that portions of the record may support a finding that the children were not at risk does not negate the evidence that supports the finding the children were at risk.[8]

_____

[8] Because we find the court did not err either in assuming jurisdiction or in finding Mother was an offending parent under counts b-1 and j-1, we need not address Mother's contention that the court erred in assuming jurisdiction and finding her an offending parent under count b-2.  (See, e.g., *In re Alexis E.*, *supra*, 171 Cal.App.4th at p. 451 ["When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether
*(Fn. is continued on the next page.)*

24

### C. *The Court Did Not Prevent Mother's Counsel From Being Heard Regarding Disposition*

After the court sustained the petition but before it moved on to disposition, DCFS's counsel asked the court to admonish Father to follow the court's orders and inform Father how close DCFS had come to asking the court to remove the children from the family home. *On this subject*, the court opined it did not need to hear from other counsel because the reports were clear that Father had violated a court order by coming to the family home; the court delivered the requested admonishment. The court then stated it had case plans for the parents and asked the parents' attorneys whether they had any issues with the proposed case plans. While the court did not expressly state it would hear argument about disposition in general, it is clear from the transcript of the proceedings that the court's query about the case plans also invited counsel to make any argument about disposition in general.

Mother argues she had "legal arguments to make both under the state law such as dismissal under section 360 and implementation of a section 301 contract and the Supreme Court case law *In re N.R.*, *supra*, directly applicable to the court's finding that father's substance abuse automatically rendered the children of such mature age removeable from the home or the father if he remained in the home." But nothing in the record supports this assertion. Mother's counsel said nothing to indicate the court was preventing him from making arguments, or even that he had any further arguments to make. In the absence of

---

any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence"].)

such evidence, we presume the juvenile court was aware of Mother's right, and afforded Mother the opportunity, to be heard on disposition.  (See, e.g. *In re Marriage of Winternitz* (2015) 235 Cal.App.4th 644, 653 [" '[w]e must presume that the court knew and applied the correct statutory and case law' and applied them to the facts in this case"].)

## DISPOSITION

The court's orders are affirmed.

NOT TO BE PUBLISHED

M. KIM, J.

We concur:

ROTHSCHILD, P. J.

WEINGART, J.

26